Avner E. Mizrahi (AM-5674)
avner@avnermizrahi.com
Law Office of Avner Mizrahi
Attorney for Plaintiffs
205 East 63rd Street, #8C
New York, NY 10021
Tel:  (646) 397-4150
Fax:  (626) 605-8972

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ─────────────────────── x | | |
| PHILIP ANDREW LEVIN and LISA MARIE KIENZLE, | ) ) ) | |
| | ) | 11 Civ. 243 (AKH) |
| Plaintiffs, | ) ) | **FIRST AMENDED COMPLAINT** |
| -against- | ) ) | **FOR DECLARATORY RELIEF;** |
| | ) | **BREACH OF CONTRACT; TORTIOUS** |
| MAP CASH HOLDINGS, LLC a/k/a | ) | **BREACH OF THE IMPLIED COVENANT** |
| MAPCASH HOLDINGS, LLC; | ) | **OF GOOD FAITH AND FAIR DEALING;** |
| MAP FINANCIAL GROUP, INC.; | ) | **BREACH OF N.Y. LABOR § 195;** |
| MAP INTERNATIONAL LIMITED; and | ) | **CONVERSION; UNJUST ENRICHMENT;** |
| MAP USA LTD., | ) | **NEGLIGENT MISREPRESENTATION** |
| | ) | |
| Defendants. | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| ─────────────────────── x | | |

        Plaintiffs PHILIP ANDREW LEVIN and LISA MARIE KIENZLE complain of

Defendants and allege as follows:

## NATURE OF THE ACTION

        1.      Philip Andrew Levin and Lisa Marie Kienzle seek a comprehensive

declaration of the rights, duties, and liabilities of all of the Defendants under the

employment contracts that MAP International, Ltd. and MAP USA, Ltd. entered into with

Mr. Levin and Ms. Kienzle to manage several of the major East Africa operations of those

companies and of MAPSwitch Uganda Ltd, a subsidiary of MAP International.

2.      Mr. Levin and Ms. Kienzle worked tirelessly for MAP International, MAP USA, and MAPSwitch Uganda (collectively, "MAP") in Uganda – Mr. Levin for approximately eighteen months and Ms. Kienzle for approximately eleven months.  Both received exceptional reviews from MAP's executives for their significant contributions to MAP.  Nonetheless, MAP refused to pay them the salary that they earned, claiming that the company was having financial difficulties.  Despite the financial difficulties, however, MAP's executives Mr. Michael Landau (Chairman) and Mr. David Eliezer "Eli" Popack (President) paid themselves more than $100,000 during this period and approximately $1 million to external vendors, investors, and other executives.  To date, Mr. Levin is owed $47,331.86 in salary and $15,824.66 in bonus that remain unpaid, and Ms. Kienzle is owed $24,589.04 in salary and $5,917.81 in bonus that remain unpaid.

3.      During their employment with MAP, Mr. Levin and Ms. Kienzle also each advanced more than $20,000 of approved expenses on MAP's behalf.  Mr. Levin has not been reimbursed $10,272.79 of those approved expenses, and Ms. Kienzle has not been reimbursed $13,248.88 of those approved expenses.

4.      MAP's executives further promised and reassured Mr. Levin and Ms. Kienzle that they would raise significant additional capital for MAP to fund growth and pay existing obligations, which included paying Mr. Levin and Ms. Kienzle their earned salary and unreimbursed expenses.  In doing so, they convinced Mr. Levin and Ms. Kienzle to remain MAP employees for much longer than they would have had they known that MAP was not serious about bringing in significant additional funds or paying Mr. Levin and Ms. Kienzle.  When Mr. Landau and Mr. Popack had the opportunity to bring in approximately $3 million for MAP, they refused to do so because the new investment

would have lessened some of their managerial control and diluted their equity position in MAP.

5.      Mr. Levin and Ms. Kienzle eventually resigned after being strung along by MAP for months.  Shortly thereafter, Mr. Landau told Mr. Levin that MAP had no intention of paying Mr. Levin or Ms. Kienzle their earned salary and advanced expenses because "if you no longer work for me, I promise you, you are not getting paid."  Mr. Landau also described MAP as "his company" and said that Mr. Levin and Ms. Kienzle are "dispensable" employees.  Mr. Landau then threatened Mr. Levin, telling him that if he even considered suing MAP, Mr. Landau would "end up suing you back for fifty times more than whatever you sue me for."

6.      Without any justification in law or fact, MAP has refused to pay Mr. Levin and Ms. Kienzle their earned salary and bonus and the expenses they advanced on MAP's behalf.

7.      MAP also is an alter ego of several other related companies, including MAP Cash Holdings, LLC a/k/a MAPCash Holdings, LLC, MAP Financial Group, Inc., and possibly other related companies of which Mr. Levin and Ms. Kienzle are not aware. These companies, among other things, operate out of the same offices, are run by the same tight-knit group of people, disregard corporate formalities, and have commingled funds. Mr. Levin and Ms. Kienzle thus seek a declaration that all of the Defendants are alter egos of each other, should be treated as a single entity, and are jointly and severally liable for all of Mr. Levin's and Ms. Kienzle's claims.

8.      Mr. Levin and Ms. Kienzle seek damages from all of the Defendants for MAP's breach of their employment contracts and for nonpayment of salary and bonus.

9.      Mr. Levin and Ms. Kienzle also seek damages for MAP's conversion of the $23,521.67 in approved expenses that they collectively advanced on MAP's behalf and restitution of those funds, with which all of the Defendants have been unjustly enriched.

10.     Mr. Levin and Ms. Kienzle also seek liquidated damages and attorney's fees under New York's labor statutes for MAP's violations of N.Y. Labor § 195, which required MAP to provide proper payment-related documentation; MAP did not do so (on the few occasions that MAP actually paid Mr. Levin and Ms. Kienzle).

11.     Mr. Levin and Ms. Kienzle also seek damages from all of the Defendants for MAP's unreasonable conduct and its violation of the implied covenant of good faith and fair dealing that it owed, and still owes, Mr. Levin and Ms. Kienzle.  MAP tortiously breached this covenant, thus acting in bad faith, and has acted contrary to any sense of decency.  MAP also made various negligent misrepresentations.

## THE PARTIES

12.     Philip Andrew Levin is an individual residing at 5215 Oakland Road, Chevy Chase, Maryland 20815.

13.     Lisa Marie Kienzle is an individual residing at 156 Thorn Run Road, Butler, Pennsylvania 16001.

14.     MAP Cash Holdings LLC a/k/a MAPCash Holdings LLC is a New York limited liability company with a place of business at 460 West 34th Street, 10th Floor, New York, New York 10001.

15.     MAP Cash Holdings, LLC ("MAP Cash") is a partnership of two individuals, Jonathan "Chesky" Malamud and David Eliezer "Eli" Popack.

16.     Mr. Malamud is an individual residing at 1372 Union Street, Brooklyn, New York 11213.

17.     Mr. Popack is an individual residing at 1245 President Street, Brooklyn, New York 11225.

18.     MAP USA, Ltd. is a Delaware corporation with a place of business at 460 West 34th Street, 10th Floor, New York, New York 10001.

19.     MAP Financial Group, Inc. ("MAP Financial") is a Nevada corporation with a place of business at 80 Broad Street, Suite 2700, New York, New York 10004.

20.     MAP International Ltd. is a Gibraltar-incorporated company with a place of business at 152 West 57th Street, 54th Floor, New York, New York 10019.

## JURISDICTION AND VENUE

21.     This Court has diversity jurisdiction over this matter under 28 U.S.C. § 1332 because the parties in this action are citizens of different states and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

22.     This Court has personal jurisdiction over all of the Defendants because they all were authorized to transact and/or were transacting business in the State of New York within the time period relevant to the claims stated herein.

23.     Venue is proper in this District under 28 U.S.C. § 1391(a)(1) and (c) because all of the Defendants reside in this District, as they are business organizations subject to personal jurisdiction in this District.  Venue also is proper in this District under 28 U.S.C. § 1391(a)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in the District.

## THE MAP ENTITIES

24.     MAP Cash is an international holding company that is active in financial services markets in emerging economies.

25.     MAP Cash was founded by Jonathan "Chesky" Malamud and David Eliezer "Eli" Popack.

26.     MAP Cash has a series of portfolio companies including MAP Financial and MAP International Limited.

27.     MAP Financial was established on June 27, 2008, to act as a holding company for five indirect, wholly-owned operating subsidiaries that provide micro lending and other non-banking financial services in the Caribbean.

28.     MAP Financial was founded by Chesky Malamud, Eli Popack, and Joel Drizin.

29.     MAP International was launched in early 2007 by Michael Landau (the company's Chairman), Eli Popack (the company's President), and Chesky Malamud.

30.     Upon information and belief, MAP International's shareholders are Carriage Trust (a Gibraltar Trust for the benefit of Michael Landau), Cape Settlement Trust (a Gibraltar Trust for the benefit of Eli Popack and/or Chesky Malamud), Forbury, Carriage, MAP Cash, Damar Estates, Reich Ins, Max Marcus, National, Prism, and Benjamin White.

31.     Upon information and belief, other individuals and business organizations have invested significant funds into MAP International.  Some of those individuals and business organizations may not officially have been provided with equity in writing but nonetheless are equity shareholders of MAP International.

32.     Mr. Popack and Mr. Malamud together and/or with others have founded all four of these companies.

33.     Mr. Popack or Mr. Malamud is an executive or partner in each of these four companies.

34.     Mr. Landau is a founder, shareholder, and/or executive of at least two of these four companies.

## MAP'S UGANDA-RELATED OPERATIONS

35.     MAP International is a startup company in the nascent branchless banking industry.  Branchless banking provides basic financial services to people in the developing world who have little or no access to financial services.

36.     In short, MAP International partners with governments and private entities in emerging markets to create broad-based electronic financial infrastructures.

37.     MAP International currently has branchless banking operations in Uganda and has been in the process of establishing such operations in Rwanda.

38.     MAP International created two wholly-owned subsidiaries, MAP USA Ltd and MAPSwitch Uganda LTD.

39.     MAP USA constitutes the executive headquarters for MAP International and serves as MAP International's center for decision-making, investor relations, and strategic development.

40.     Michael Landau (Chairman), Eli Popack (President), and Benjamin White (Chief Operating Officer) all work out of MAP USA's New York executive offices.

41.     MAP USA and MAP International are the same entity with the exception that MAP USA is incorporated in the United States and MAP International is incorporated

in Gibraltar.  Otherwise, the entities are identical and are operated by the same group of executives; MAP USA's purpose is simply for MAP International to have a U.S. presence.

42.     MAPSwitch Uganda is an operational entity based in Kampala, Uganda, responsible for deploying MAP International's strategy in the Ugandan market.

43.     Although MAP International had plans to expand to other markets, those plans never materialized beyond initial kick-off discussions, and these three MAP entities – MAP International, MAP USA, and MAPSwitch Uganda – within the time period relevant to the claims stated herein have all operated as a single entity focused on the Ugandan market.  As such, these three entities will be referred to herein collectively as "MAP."

## MR. LEVIN'S EMPLOYMENT WITH MAP

44.     In February 2009, Philip Levin was working as a consultant for the consulting firm Oliver Wyman in Manhattan when he was approached by a friend about the idea of moving to Uganda and working for a startup company focused on branchless and mobile banking.  Believing that this company offered a for-profit business model that also produced humanitarian outcomes (banking the unbanked), Mr. Levin decided to seek out this opportunity and interviewed with MAP.

45.     After several interviews, MAP offered Mr. Levin a six month fellowship with the understanding that, dependent on his performance, he would be promoted to a full-time employee position at the end of the six months.

46.     Mr. Levin accepted the position and took a six month leave of absence from Oliver Wyman to pursue the fellowship opportunity with MAP.

47.     Mr. Levin moved to Uganda and began his fellowship with MAP on March 22, 2009.

48.     While in Uganda, Mr. Levin's main duties consisted of managing and launching MAP's mobile banking business and point-of-sale retail network in Uganda.

49.     Mr. Levin managed relationships with Uganda Telecom, a major telecommunications provider in Uganda, to launch and operate MAP's mobile banking technology platform, which, among other things, allows customers to transfer money using their mobile phones.

50.      In September 2009, Mr. Levin was offered a promotion to full time employment as Director of Mobile Banking because of his "significant impact" on MAP's operations in Uganda over the six months of his fellowship and his "dedication to the cause" and "ability to work in the differing environments" of Uganda – all of which were "noted across the [MAP] organization."  See Offer Letter from MAP to Philip Levin (effective Sept. 1, 2009), attached as Exhibit 1.

51.     MAP provided Mr. Levin with an offer letter, which served as his employment contract with MAP and was signed by MAP's Chief Operating Officer, Benjamin White.

52.     Mr. Levin's offer letter described his roles and responsibilities and the salary and benefits that he would receive as MAP's Director of Mobile Banking.  It provided nine different types of benefits:

    a. Base Compensation:  $80,000 per annum, paid in accordance with current
      company payroll procedures, which would increase to more competitive levels as

the company was to transition from startup/launch phase to ongoing revenue generation;

b. <u>Bonus Plan:</u> Participation in the Annual Company Bonus Plan (a percentage of Mr. Levin's base salary paid during the calendar year);

c. <u>Equity:</u> Participation in Equity-Based Profit Sharing Plan (ESOP);

d. <u>Business Tools:</u>  MAP's executive toolkit of technology devices (a laptop, blackberry, local-country cellular phone, internet connectivity, and VOIP phone for your home);

e. <u>Expatriate Program:</u> A monthly EXPAT stipend of $1,350 to cover housing and related expenses to be paid on the first of each month;

f. <u>Travel:</u>  Once every eight weeks, one week in the United States to be utilized for business activities in MAP's New York office;

g. <u>Vacation:</u> To be taken as needed and approved by Mr. Levin's supervisor;

h. <u>Credit card:</u>  A company corporate credit card to be used for business related expenses as identified in the Company's travel and expenses policies;

i. <u>Medical Coverage:</u>  As of June 2010, enrollment in an International Health plan created specifically for global professionals.  Before then, "International Citizen" medical insurance (Reside Prime) and a yearly check-up with a general practitioner, dentist, and optometrist in the United States, and all travel-related vaccinations and medical attention as prescribed by the US CDC for international travel and appropriate travelers' insurance.

53.     Mr. Levin accepted the offer and became MAP's Director of Mobile Banking effective September 1, 2009.

## MS. KIENZLE'S EMPLOYMENT WITH MAP

54.     In June 2009, Lisa Kienzle was living and working in Rwanda for Millennium Promise as the Country Business Manager of the Millennium Villages Project in Mayange, Rwanda, supporting business development efforts of the villages in Mayange.  She was approached in September 2010 by a friend about the idea of moving to Uganda and working for MAP.  For similar reasons as Mr. Levin, she too was excited about working for a for-profit business that also produced humanitarian outcomes.

55.     After several interviews, MAP offered Ms. Kienzle a six month fellowship with almost identical terms as Mr. Levin's with the understanding that, dependent on her performance, she would be promoted to a full-time employee position at the end of the six months.

56.     Ms. Kienzle accepted the position, moved to Uganda, and began her fellowship with MAP on October 12, 2009.

57.     While in Uganda, Ms. Kienzle's main duties consisted of supporting MAP's biometric data capture exercise for Wazalendo SACCO, a Ugandan savings and credit cooperative, and managing and launching MAP's branchless banking business in Uganda.

58.     Ms. Kienzle managed relationships with PostBank Uganda, a major bank in Uganda, to facilitate the launch and operation of MAP's branchless banking technology platforms, which, among other things, allow customers to access their bank accounts through a network of agents in regions of Uganda where physical bank branches do not exist.

59.     In April 2010, Ms. Kienzle was offered a promotion to full time employment as Director of Branchless Banking because of her "significant impact" on MAP's operations in Uganda over the six months of her fellowship and her "dedication to the cause" and "ability to work in the differing environments" of Uganda – all of which were "noted across the [MAP] organization."  See Offer Letter from MAP to Lisa Kienzle (effective April 15, 2010), attached as Exhibit 2.

60.     MAP provided Ms. Kienzle with an offer letter, which served as her employment contract with MAP and was signed by MAP's Chief Operating Officer, Benjamin White.

61.     The offer letter was almost identical to Mr. Levin's offer letter and described Ms. Kienzle's roles and responsibilities and the salary and benefits that she would receive as MAP's Director of Branchless Banking.  The offer letter provided the identical nine types of benefits that Mr. Levin's offer letter provided him, as described in paragraph 52 above.  Ms. Kienzle's offer letter additionally guaranteed her one OB/GYN appointment each year.  Mr. Levin's and Ms. Kienzle's offer letters will be referred to herein as the "Employment Contracts"

62.     Ms. Kienzle accepted the offer and became MAP's Director of Branchless Banking effective April 15, 2010.

63.     Other than providing business tools and vacation to Mr. Levin and Ms. Kienzle, MAP breached every single applicable term of the Employment Contracts (for example, the ESOP was not applicable because it was not scheduled to go into effect until 4th quarter 2010).

## MAP'S FAILURE TO REIMBURSE MR. LEVIN AND MS. KIENZLE FOR APPROVED EXPENSES THAT THEY ADVANCED ON MAP'S BEHALF

64.     Because Mr. Levin and Ms. Kienzle never received the corporate credit cards that MAP promised them in the Employment Contracts, Mr. Levin and Ms. Kienzle were forced to personally advance tens of thousands of dollars in approved expenses on MAP's behalf throughout their fellowships and employment.

65.     In lieu of corporate credit cards, MAP's executives based in New York told Mr. Levin and Ms. Kienzle that because they were on the ground in Uganda, it made sense for them to advance expenses when necessary and submit reimbursement requests, and then MAP would promptly reimburse those fronted expenses.

66.     Mr. Levin and Ms. Kienzle only advanced those expenses because they relied on those MAP executives' assurances that they would be promptly reimbursed for the out-of pocket expenses that they advanced.

67.     Relying on those assurances, Mr. Levin advanced more than $30,000 on MAP's behalf for vehicles, corporate housing, telecommunications, transport, entertainment, supplies, lodging, and a variety of other types of expenses.

68.     Similarly relying on those assurances, Ms. Kienzle advanced more than $20,000 on MAP's behalf for vehicles, corporate housing, telecommunications, transport, entertainment, supplies, lodging, and a variety of other types of expenses.

69.     Mr. Levin and Ms. Kienzle both paid out of pocket for the interim medical insurance that MAP promised them in the Employment Contracts.  They have not been fully reimbursed those costs.

70.     Mr. Levin and Ms. Kienzle paid out of pocket for approved international flights including those stipulated in the Employment Contracts.  They have not been fully reimbursed those costs.

71.     Mr. Levin, at the behest of MAP's executives, purchased a company car for use by MAP employees on business-related travel.

72.     On November 2, 2009, he reached an oral agreement with the executives that he would purchase a car on the company's behalf.  The car was selected for newness and reliability for long-term company use and was thus more expensive than a car he would have purchased for personal use.

73.     Mr. Levin paid 13 million Ugandan shillings, at the time $6,699 for the car.

74.     MAP promised to buy back the car at the purchase price of $6,699 if Mr. Levin 's employment with MAP ever terminated.

75.     On September 3, 2010, after Mr. Levin resigned, he sent an email to Mr. Landau (MAP's Chairman) and Roscoe Nsubuga (MAPSwitch Uganda's Managing Director) asking them to buy back the car from him.

76.     Neither Mr. Landau nor Mr. Nsubuga responded to Mr. Levin's September 3, 2010 email asking them to repurchase the car.

77.     Mr. Levin was forced to sell the car on September 13, 2010 to Emmanuel Tayebwa (a MAPSwitch Uganda employee) for $4,440 at a loss of $2,259.

78.     In total, including the loss from the car, MAP has not reimbursed Mr. Levin $10,272.79 of the approved expenses that he advanced out of his own pocket on MAP's behalf.

79.     On February 19, 2010, Ms. Kienzle also purchased a car.

80.     On February 22, 2010, Mr. White (MAP's COO) confirmed to Ms. Kienzle via email that the same agreement that MAP had arranged with Mr. Levin when he purchased his car also applied to Ms. Kienzle and the car that she purchased.

81.     As such, MAP promised to buy back Ms. Kienzle's car at the purchase price if Ms. Kienzle's employment with MAP ever terminated.

82.     Ms. Kienzle paid 9.5 million Ugandan Shillings, or $4,750 at the time, for the car.

83.     Ms. Kienzle was unable to sell the car by the time she had to leave Uganda. A friend of hers is currently holding the car and will give it to MAP if MAP pays Ms. Kienzle $4,750.  As a result of not being reimbursed for the car, Ms. Kienzle has sustained a loss of $4,750.

84.     In total, including the loss from the car, MAP has not reimbursed Ms. Kienzle $13,248.88 of the approved expenses that she advanced out of her own pocket on MAP's behalf.

85.     In April 2010, Ms. Kienzle had run out of money because of the thousands of unreimbursed dollars that she advanced on MAP's behalf.  She considered resigning from MAP, but was reassured and promised that new capital would be coming into MAP and that she would be reimbursed shortly.  However, her monthly student loan payments and rent for the next three months were about to come due.   To avoid defaulting on these loans, Ms. Kienzle was forced to borrow $7,000 from a friend.

86.     In total, Ms. Kienzle has had to borrow more than $13,000 from friends and family (which she has not yet been able to fully pay back) because MAP's executives misrepresented their ability to reimburse expenses she advanced on MAP's behalf.

## MAP'S FAILURE TO PAY MR. LEVIN AND MS. KIENZLE THEIR EARNED SALARIES AND BONUSES

87.     From September 15, 2009, when his employment as Director of Mobile Banking began, through January 25, 2010 Mr. Levin was paid his salary on an untimely, irregular basis.  He received his first salary payment on October 21, 2009, approximately seven weeks after his start date.  Between October 21, 2009 and January 25, 2010, Mr. Levin received irregularly timed salary payments, sometimes three weeks apart, other times longer.

88.     After January 25, 2010, Mr. Levin did not receive another salary payment for the next six months.  MAP management did not notify Mr. Levin of their decision to stop paying him.

89.     Ms. Kienzle similarly was not paid during that period.  Her first salary payment became due on April 29, 2010, two weeks after her start date as MAP's Director of Branchless Banking.  She did not receive that salary payment.

90.     Ms. Kienzle did not receive a single salary payment over the first three and a half months of her full time employment.

91.     Ms. Kienzle and Mr. Levin regularly inquired about MAP's failure to pay them, but were told that MAP was struggling and was trying to acquire additional capital so that MAP could pay them.

92.     MAP's executives continuously told Mr. Levin and Ms. Kienzle that they would be paid as soon as additional money came into MAP.  MAP's executives convinced Mr. Levin and Ms. Kienzle to remain with the company with such promises and reassurances.

93.     From Janaury 1, 2010 until July 31, 2010, MAP maintained that it could not afford to pay Mr. Levin or Ms. Kienzle (with the exception of the small payment noted below) despite more than $1 million that came into the company through revenue and additional investment during that period.

94.     Upon information and belief, the $1 million proceeds from revenue and investment was primarily paid to external vendors, external creditors, and company executives (including Mr. Landau and MAPSwitch Uganda Managing Director Roscoe Nsubuga) instead of Mr. Levin or Ms. Kienzle.

95.     Upon information and belief, payments to Mr. Landau may have been used to service off-book loans.

96.     MAP used a very small portion of the $1 million to pay Mr. Levin $5,000 (gross) in owed salary on July 25, 2010.  This was the only salary payment he received after January 25, 2010.

97.     Ms. Kienzle similarly received $5,000 (gross) in owed salary on July 25, 2010.  This was the only salary payment Ms. Kienzle ever received from MAP.

98.     As discussed below, as a result of MAP's failure to pay them, Mr. Levin and Ms. Kienzle resigned.  After their resignations, additional funds came into MAP but none were paid to Mr. Levin or Ms. Kienzle.

99.     Upon information and belief, Mr. Popack used $25,000 of these funds to pay himself.

100.    In addition to unpaid salary, Mr. Levin and Ms. Kienzle never received the bonuses that MAP promised them in the Employment Contracts.

## MAP MANAGEMENT'S MISREPRESENTATIONS FALSELY OFFERING MR. LEVIN AND MS. KIENZLE EQUITY INTENDED TO CONVINCE MR. LEVIN AND MS. KIENZLE TO REMAIN WITH MAP

101.    As another tactic to convince Mr. Levin and Ms. Kienzle to remain at MAP without payment, Mr. Popack promised them shares in the company.

102.    In separate but identical July 30, 2010 emails to Mr. Levin and Ms. Kienzle, Mr. Popack wrote, "In appreciation for all that you have, and continue to do, I have asked our counsel to begin the process of issuing you with some common shares in the company. . . .  These shares should be viewed as being completely separate from any equity you will receive as a part of your compensation package in the ESOP."

103.    The email accomplished what it intended:  it convinced Mr. Levin and Ms. Kienzle to remain employed with and to keep working hard on behalf of MAP, despite not being paid.  Taking Mr. Popack at his word, Mr. Levin responded by saying, "The shares are definitely a welcome surprise!  I'm honored that you are willing to share some of the business with me.  I know everyone in New York is hard at work trying to raise additional funds.  We will keep at the operations running as best we can so that we don't lose a step when they [sic] money comes in."  Ms. Kienzle similarly thanked Mr. Popack, replying to his email: "I'm also very excited to see where MAP is going.  I truly believe in the company - what we're trying to do, the team we have on board - and that energizes me to do all I can to help us get there."

104.    Despite Mr. Popack's promises, Mr. Levin and Ms. Kienzle never again heard anything about their receiving any equity in MAP nor did they ever receive any MAP equity.

**MAP MANAGEMENT'S MISREPRESENTATIONS ABOUT ADDITIONAL CAPITAL INVESTMENTS INTENDED TO CONVINCE MR. LEVIN AND MS. KIENZLE TO REMAIN WITH MAP**

105.    In launching MAP, Mr. Popack, Mr. Malamud, and Mr. Landau had raised significant capital through private investors and debt from the Overseas Private Investment Corporation ("OPIC").  Upon information and belief, more than $4 million of this capital was spent before Mr. Levin and Ms. Kienzle joined MAP, including almost $500,000 on travel expenses such as private jet travel for Mr. Landau in Africa.

106.    MAP began to run low on capital at the beginning of 2010, prompting the need to raise additional funds.

107.    Mr. Levin and Ms. Kienzle were made to believe that MAP's founders, Mr. Popack and Mr. Landau, were well-connected and capable of raising the additional funds required to grow and maintain the MAP business.

108.    Mr. Levin and Ms. Kienzle believed that the company was going to be financed, not only with short-term capital to address immediate needs but also with a larger long-term capital infusion to support growth.

109.    At all times, Mr. Levin and Ms. Kienzle were meant to believe that these deals were on the verge of closing and that Mr. Levin and Ms. Kienzle would then be paid.

110.    MAP executives began promising large capital infusions in January 2010, telling Mr. Levin that an investor was interested in contributing $20 million, and that MAP "would show him (Mr. Levin) the goods next week."  This deal never materialized.

111.    Around this time, MAP executives began promising a bridge loan from the original investors to support salaries and other company expenses until a larger investment arrived.  This deal never materialized.

112.    As 2010 progressed, MAP executives attended meetings with other institutional investors for major investments, including such firms as Soros Fund Management LLC, Lonhro PLC, and Developing World Markets.

113.    Several of these discussions progressed to the point where the investors required materials for their diligence process.  Mr. Levin and Ms. Kienzle were asked to assist in gathering those materials.  This progress further served to convince Mr. Levin and Ms. Kienzle that a large investment was probable for the company.  However, no institutions invested in MAP or visited the operation in Uganda.

114.    Beginning March 2010, MAP executives were speaking with their current loan provider, OPIC, to bring in additional capital.  It was portrayed to Mr. Levin and Ms. Kienzle as highly certain.  This deal also never materialized.

115.    Mr. Levin and Ms. Kienzle were also told that MAP's executives were "pitching [National Football League] players (who are interested in coming to Uganda)" through Jim Brewer to try to capitalize the company.  The players never visited and they never invested any funds.

116.    Beginning in May 2010, money still had not come into MAP, and Mr. Levin and Ms. Kienzle began to more urgently voice their concerns to company management, who continued to assure them that funds would come in shortly.

117.    Investor updates became a regular part of discussions on conference calls between the Ugandan expatriate team of Mr. Levin and Ms. Kienzle and MAP's New York executives.

118.    In a June 30, 2010 email, Mr. Levin asked whether investments were going to come in that could be used to pay Mr. Levin's and Ms. Kienzle's unpaid salaries and unreimbursed expenses.  The response Mr. Levin received was:  "In regards to investment, the answer is of course Yes."

119.    Mr. White (MAP's COO) and Alan Operman (MAP's Senior Vice President) began organizing a transaction that would bring in the necessary capital to MAP.

120.    In this transaction, Mr. White and Mr. Operman had identified investors to bring in $2 to $4 million.

121.    On July 19, 2010, the transaction was described by Mr. White to Mr. Levin and Ms. Kienzle as almost certain:  "Things are feverishly moving with the transaction. Eli [Popack, MAP's President] and Michael [Landau, MAP's Chairman] are doing everything possible - and we have given them a deadline of this friday.  Although stressed, Eli is confident that this will take place."  The Friday deadline was not met.

122.    That Friday, July 23, 2010, Mr. White further relayed that "Michael and Eli have a series of 'final stage' meetings with folks to bring in the AP [funds to cover MAP's accounts payable, including Mr. Levin's and Ms. Kienzle's unpaid salary and expenses] at the beginning of next week," which would "bring in a significant portion of payables in the near term."  Again, Mr. Popack and Mr. Landau did not meet this early week deadline.

123.   By the next week, Ms. Kienzle had depleted the money that she had borrowed from her friends and family because of MAP's failure to pay her a single salary payment to that point.  She voiced extreme concern with her situation and skepticism in MAP's ability to secure necessary capital and pay the fast-growing back-salary and expenses that she and Mr. Levin were accruing.

124.   Following her expression of discontent, Mr. Popack reached out to Mr. Levin and Ms. Kienzle in separate but similar emails on July 30, 2010, noting "we will hopefully be able to conclude an equity investment in short order."

125.   As the potential investors begun to conduct more due diligence into MAP's finances, they learned that MAP was in significantly worse financial shape than they had imagined.

126.   Internal documents show that as of August 16, 2010, the company had accumulated more than $1.5 million in debt and accounts payable.  Accounts Payable Review (Aug. 16, 2010) Aug attached as Exhibit 3.

127.   In addition to the official debt, it later surfaced that Mr. Landau had initiated off-book loans without informing the company's officers or following the proper accounting practices.

128.   Upon information and belief, to compensate for the substantial company debt, lack of proper corporate accounting, and off-book transactions, the potential investors required a large ownership stake and shift in management in order to complete the investment.

129.    Citing their unwillingness to dilute their equity stake and relinquish any control, Mr. Landau and Mr. Popack rejected the deal, without any immediate alternative for fully capitalizing the company or paying Mr. Levin and Ms. Kienzle.

## MR. LEVIN'S AND MS. KIENZLE'S RESIGNATIONS

130.    When Mr. Levin and Ms. Kienzle learned that Mr. Landau and Mr. Popack had rejected the aforementioned deal, they demanded a phone call with Mr. Popack to discuss the future of the company and the likelihood of their getting paid.

131.    On August 10, 2010, Mr. Popack spoke on the phone with Mr. Levin and Ms. Kienzle about the deal.  He assured them that he had a path toward raising money, citing interested investors, a loan repayment of approximately $200,000 that would be coming into MAP in the next few days, and a possible partnership with a related company in South America.

132.    Mr. Levin and Ms. Kienzle told Mr. Popack that they had heard too many unfulfilled promises from him and that his assurances and promises would no longer satisfy them.

133.    That same day, August 10, 2010, Mr. Levin and Ms. Kienzle sent Mr. Popack an email stating that they did not believe MAP could function without additional significant capital and that they would resign if MAP did not bring in additional funds by that Friday, August 13, 2010.  Email from Mr. Levin to Mr. Popack re "Following today's call" (Aug. 10, 2010), attached hereto as Exhibit 4.

134.    Ms. Kienzle was in New York later that week and met with Mr. Popack for lunch on August 12, 2010 to discuss these problems.

135.    At one point during the lunch meeting, Ms. Kienzle told Mr. Popack that it was so urgent for her to be paid because she already had been forced to borrow thousands of dollars from friends and family to survive.  Mr. Popack responded, "yes, me too!  I've also had to borrow money!"  Ms. Kienzle was shocked by this response, as they were eating in the private dining room of Solo, a very expensive New York restaurant (at Mr. Popack's invitation).

136.    During the meeting, Mr. Popack once again asked for more time to pay Mr. Levin and Ms. Kienzle.  While asking them to continue as employees, he said "what if we started paying you regularly, or somewhat regularly?"  He made no mention of reimbursing what was owed.

137.    Thus, on Friday, August 13, 2010, Ms. Kienzle sent Mr. Popack a letter of resignation via email for herself and Mr. Levin.  Email from Ms. Kienzle to Mr. Popack re Letter o[f] Resignation (Aug. 13. 2010), attached hereto as Exhibit 5.

138.    Mr. Popack seemed not take Mr. Levin and Ms. Kienzle's statements seriously.  He did not acknowledge their resignation and simply wrote in a separate email moments later that he was having an investment meeting that weekend and would update them on the progress.  He never updated Mr. Levin or Ms. Kienzle.

139.    On Tuesday August 17, 2010, Mr. Levin sent Mr. Popack and Mr. Landau a post-resignation email discussing transition and detailing the amounts owed them. Email from Philip Levin to Eli Popack re Transition from MAP (post-resignation) (Aug. 17, 2010), attached hereto as Exhibit 6.

140.    On Tuesday August 17, 2010, Ms. Kienzle also sent Mr. Popack a heartfelt email explaining her financial situation, that the expenses she advanced on MAP's behalf

had wiped out her savings, that MAP's failure to pay her had forced her to borrow more than $13,000 from family and friends, that she still had school loans to pay back and had no funds to do so, and that MAP's Ugandan employees were suffering as well.  Email from Ms. Kienzle to Mr. Popack re Personal Finances (Aug. 17, 2010), attached hereto as Exhibit 7.

141.    Mr. Popack never responded to Ms. Kienzle's email.

142.    Trying to convince Mr. Levin and Ms. Kienzle to rescind their resignations, Mr. Popack and Mr. Landau continued to promise Mr. Levin and Ms. Kienzle that they were bringing money into the company.  In response, Mr. Levin asked Mr. Popack to put together a list showing how his and Ms. Kienzle's owed salaries and unreimbursed expenses would be prioritized (the "Prioritization List") in relation to other company debts.

143.    Mr. Popack promised to put together the Prioritization List.  He never did.

144.    In five separate emails, Mr. Levin asked Mr. Popack to draft the Prioritization List.  Mr. Popack first tried to ignore the request.  Mr. Popack then said he would have the list to Mr. Levin and Ms. Kienzle by Sunday, August 22, 2010.  Mr. Popack did not send the Prioritization List on August 22, 2010 or on any other date, despite promising to do so.

145.    Once Mr. Levin and Ms. Kienzle resigned, Mr. Popack and Mr. Landau continuously refused to commit to paying Mr. Levin and Ms. Kienzle with any future money that would come into MAP.

146.    Ms. Kienzle left Uganda on August 27, 2010.

147.   During this period, Mr. Landau asked Mr. Levin to lie to MAP's Ugandan clients and tell them that he had been absent and unresponsive because of a "family emergency."  Mr. Levin refused to heed Mr. Landau's unethical request.

148.   Mr. Landau came to Uganda on August 30, 2010 and met with Mr. Levin.

149.   During that meeting Mr. Landau told Mr. Levin that MAP would not be paying Mr. Levin or Ms. Kienzle what it owed them if they chose to leave MAP and that there was only a chance they would be paid if they remained with the company.

150.   Mr. Landau also told Mr. Levin that he and Ms. Kienzle were dispensable employees.

151.   Mr. Landau also told Mr. Levin that MAP was his (Mr. Landau's) company and that he has the power to determine how and when money is spent.

152.   Mr. Landau also threatened Mr. Levin, telling him that if he even thought about suing MAP over unpaid wages, Mr. Landau and MAP would "end up suing you back for fifty times more than whatever you sue me for."

153.   On August 31, 2010, shortly after his meeting with Mr. Landau, Mr. Levin left Uganda.

154.   Mr. Popack and Mr. Landau have not contacted Mr. Levin or Ms. Kienzle since that date or provided any payment of owed salary.

### MR. LEVIN'S AND MS. KIENZLE'S DEMANDS FOR PAYMENT

155.   On December 31, 2010, Mr. Levin and Ms. Kienzle, through their attorney, sent MAP International and MAP USA's Chairman and President identical letters demanding payment by January 12, 2011; the letters indicated that if Mr. Levin and Ms. Kienzle were not paid by that date, they would be forced to file suit.  See Demand

Letters from Avner Mizrahi, Esq. to Michael Landau and David Eliezer Popack (Dec. 31, 2010) (the "Demand Letters"), attached as Exhibit 8.

156.    Mr. Levin and Ms. Kienzle are now filing suit because they have not been paid the salary and unreimbursed expenses owed to them.

### THE VARIOUS MAP ENTITIES ARE ALTER EGOS OF ONE ANOTHER

157.    In the Demand Letters, Mr. Levin and Ms. Kienzle noted that several other MAP-related entities operated out of the same address in New York, New York, and that several MAP-related entities, including MAP Financial and MAP International Ltd. were portfolio companies of MAP Cash.

158.    MAP Cash also operates under the name MAP Holdings, and has or had a company website at www.MAPholdings.com.

159.    MAP Cash holds itself out as having several portfolio companies, including MAP Financial and MAP International (which wholly owns MAP USA).

160.    On December 31, 2010, the date that MAP International and MAP USA received the Demand Letters, MAP Cash 's website listed MAP Financial and MAP International as portfolio companies.  See www.MAPholdings.com/portfolio.html, as of December 31, 2010, attached hereto as Exhibit 9.

161.    On January 5, 2010 (less than one week later), the page related to MAP Cash's portfolio companies was taken down and instead that link stated, "404 (Page Not Found) error."

162.    Two days later, on January 7, 2010, the entire website, www.MAPholdings.com, was taken down, and it is still down as of the date of the filing

of this complaint.  See www.MAPholdings.com, as of January 12, 2011, attached hereto as Exhibit 10.

163.    Upon information and belief, MAP Cash removed its publicly declared relationship to MAP International and its other portfolio companies in response to Mr. Levin and Ms. Kienzle's Demand Letters and out of fear that public information existed that linked MAP Cash and MAP Financial to MAP International.

164.    Upon information and belief, Mr. Chesky Malamud, Mr. Eli Popack, and/or Mr. Michael Landau founded, operate, manage, serve as directors for, and/or are shareholders of MAP Cash, MAP Financial, MAP International, and MAP USA.

165.    Upon information and belief, the individuals operating MAP Cash and the portfolio companies MAP International (including its wholly owned U.S. subsidiary, MAP USA) and MAP Financial are a small tight-knit group of shareholders who operate these entities as alter egos of each other by, among other things,

a. disregarding corporate formalities (including by failing to maintain adequate corporate records);

b. thinly capitalizing some or all of these various entities;

c. treating these various entities as one large entity;

d. funneling funds from entity to entity with inadequate, if any, documentation;

e. commingling funds and/or assets;

f. treating the assets of each entity as the assets of the other entities and/or as assets of one large corporate entity; and/or

g. operating all of these entities, at least at one point in time, out of a single office on the 10th Floor of 460 West 34th Street, New York, NY 10001.

166.    Upon information and belief, MAP Financial, for example, obtained a $250,000 "loan" from MAP International, but instead of the whole loan being repaid, only $150,000 was paid back to MAP International and the remaining $100,000 was paid directly to Mr. Landau.

167.    Upon information and belief, no adequate or appropriate records were kept of this "loan."

168.    For example, MAP Financial obtained a $212,801 "loan" from MAP Cash that bore no interest and had no due date.

169.    For example, Mr. Levin's, Ms. Kienzle's, and other MAP employees' mobile phones were listed under MAP Cash's AT&T Wireless corporate account, despite those phones being used for MAP-related work.

170.    For example, Mr. Levin's w2 – the only pay stub he ever received from MAP during more than eleven months of employment – listed MAP USA Ltd. as Mr. Levin's employer and listed MAP USA Ltd.'s address as 460 West 34th Street, 10th Floor, New York, NY 10001, which is MAP Cash's address (or was up until and including December 31, 2010, the day that Mr. Levin and Ms. Kienzle sent the Demand Letters.)

171.    MAP Financial also was located at that address at least through January 2009.

172.    Upon information and belief, MAP Cash and MAP Financial employees, including Aaron Popack and Samuel Rosenberg, were often used by and deployed to MAP at the cost of MAP Cash and MAP Financial.

173.    Upon information and belief, Eli Popack frequently did MAP Cash work while at MAP's New York office and instructed other employees to do the same.

174.    Upon information and belief, MAP hired a Mr. Kalton to raise funds for MAP, but MAP management then deployed Mr. Kalton to raise funds for MAP, MAP Cash, and MAP Financial as a single group.

175.    Upon information and belief, none of these companies dealt with each other at arms length.

176.    Upon information and belief, MAP employees were asked to report to MAP Cash's 34th Street Office to provide business updates to MAP Cash partners, including Mr. Malamud.

177.    Upon information and belief, Mr. Eli Popack and Mr. Landau consistently told clients, customers, and potential investors that MAP, MAP Cash, and MAP Financial all were part of the same MAP family.

178.    Upon information and belief, MAP Cash, MAP Financial, and MAP all share or shared the exact same MAP logo and color scheme

179.    Upon information and belief, MAP work often was conducted at MAP Cash's 34th Street office as well as at MAP Financial's Broad Street office.

180.    Upon information and belief, MAP meetings with outsiders often were held at MAP Financial's Broad Street office.

181.    Upon information and belief, some potential MAP investors required an exploration of MAP Cash and MAP Financial records and operations before investing in MAP.

182.    Upon information and belief, MAP Cash and/or MAP Financial have paid MAP bills.

183.   Eli Popack is either a founder, director, executive, or partner of each of these four companies.

184.   Chesky Malamud is either a founder, director, executive, or partner of each of these four companies.

185.   Michael Landau is either a founder, shareholder, director, and/or executive of at least two of these four companies.

186.   Therefore, MAP Cash Holdings, LLC, MAP Financial Group, Inc., MAP International Limited, and MAP USA Ltd. – and possibly other companies, whether parents, subsidiaries, sister companies, portfolio companies, or any other companies controlled by these entities of which Mr. Levin and Ms. Kienzle are not currently aware – are all alter egos of each other.

187.   Because all of the Defendants are alter egos of each other, MAP International and MAP USA's failure to pay Mr. Levin and Ms. Kienzle should be deemed a failure of all of the Defendants severally and jointly, and all of the Defendants thus should be held liable to pay Mr. Levin and Ms. Kienzle their owed salary and unreimbursed expenses, and for all other relief demanded herein.

## FIRST CLAIM FOR RELIEF
### (Declaratory Relief)

188.   Mr. Levin and Ms. Kienzle reallege and incorporate by reference herein each allegation contained in paragraphs 1 through 187 above.

189.   MAP, through its Chairman Michael Landau, has contended that it has no obligation to pay Mr. Levin and Ms. Kienzle their earned salary and unreimbursed expenses.  Mr. Levin and Ms. Kienzle dispute MAP's contentions.

190.   Mr. Levin and Ms. Kienzle contend that

a. they both substantially performed the duties required in the Employment Contracts, to the extent required by law and not waived or otherwise excused;

b. they consistently received positive reviews about their contributions from MAP executives;

c. Mr. Levin earned $47,331.86 in salary and $15,824.66 in bonus that remain unpaid, and Ms. Kienzle earned $24,589.04 in salary and $5,917.81 in bonus that remain unpaid;

d. Mr. Levin advanced $10,272.79 in approved expenses on MAP's behalf that remain unreimbursed, and Ms. Kienzle advanced $13,248.88 in approved expenses on MAP's behalf that remain unreimbursed;

e. MAP International, MAP USA, MAP Cash Holdings, LLC, and MAP Financial Group are all alter egos of each other and the debts of any are jointly and severally the debts of all;

f. MAP is required to pay Mr. Levin his earned salary and bonus and reimburse his advanced expenses and is required to pay Ms. Kienzle her earned salary and bonus and reimburse her advanced expenses.

191. Mr. Levin and Ms. Kienzle are informed and believe, and based thereon allege, that MAP disputes Mr. Levin's and Ms. Kienzle's contentions.

192. An actual and justiciable controversy exists between Mr. Levin and Ms. Kienzle, on the one hand, and the Defendants, all of which are alter egos of each other, on the other hand, concerning the matters alleged herein.

193. Mr. Levin and Ms. Kienzle seek a judicial declaration confirming that Mr. Levin and Ms. Kienzle both substantially performed the duties required in the

Employment Contracts, to the extent required by law and not waived or otherwise excused; Mr. Levin and Ms. Kienzle  consistently received positive reviews about their contributions from MAP  executives; Mr. Levin earned and is entitled to $47,331.86 in salary and $15,824.66 in bonus that remain unpaid, and Ms. Kienzle earned and is entitled to $24,589.04 in salary and $5,917.81 in bonus that remain unpaid; Mr. Levin advanced $10,272.79 in approved expenses on MAP's behalf that remain unreimbursed, and Ms. Kienzle advanced $13,248.88 in approved expenses on MAP's behalf that remain unreimbursed; MAP Cash Holdings, LLC, MAP Financial Group, Inc., MAP International Limited, and MAP USA Ltd. are all alter egos of each other and the debts of any are jointly and severally the debts of all; all of the Defendants, which are all alter egos of each other, are jointly and severally required to pay Mr. Levin his earned salary and bonus and reimburse his advanced expenses and are required to pay Ms. Kienzle her earned salary and bonus and reimburse her advanced expenses.

### <u>SECOND CLAIM FOR RELIEF</u>
**(Breach of Contract)**

194.    Mr. Levin and Ms. Kienzle reallege and incorporate by reference herein each allegation contained in paragraphs 1 through 193 above.

195.    By virtue of its aforementioned conduct, including its failure to pay Mr. Levin and Ms. Kienzle their annual base salaries, their earned bonuses, and the expenses Mr. Levin and Ms. Kienzle advanced on its behalf, MAP has breached and continues to breach its contractual obligations under Mr. Levin's and Ms. Kienzle's Employment Contracts.

196.     As a direct and proximate result of MAP's wrongful breach of Mr. Levin's and Ms. Kienzle's Employment Contracts, Mr. Levin and Ms. Kienzle have been and continue to be damaged in their property.

197.     To the extent not waived or otherwise excused, Mr. Levin and Ms. Kienzle have complied with all terms and conditions in the Employment Contracts and have performed under the Employment Contracts to the extent required by law.

198.     As a direct and proximate result of the breaches of all of the Defendants, which are all alter egos of each other, Mr. Levin and Ms. Kienzle have been damaged in an amount to be proven at trial, but not less than $117,185.04.

### THIRD CLAIM FOR RELIEF
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

199.     Mr. Levin and Ms. Kienzle reallege and incorporate by reference herein each allegation contained in paragraphs 1 through 198 above.

200.     Implied in Mr. Levin's and Ms. Kienzle's Employment Contracts with MAP, was a covenant that MAP would act in good faith and deal fairly with Mr. Levin and Ms. Kienzle, that MAP would do nothing to interfere with Mr. Levin's and Ms. Kienzle's rights to receive the benefits of the Employment Contracts, and that MAP would give at least the same level of consideration to Mr. Levin's and Ms. Kienzle's interests as MAP gives to its own interests.  Instead of complying with these duties, MAP acted in bad faith by, among other things,

   a. intentionally refusing to pay Mr. Levin and Ms. Kienzle their earned salary and
      unreimbursed expenses;

b. forcing Ms. Kienzle to borrow from friends and family and to become financially ruined because of MAP's failure to pay her earned salary or reimburse the expenses she advanced on MAP's behalf;

c. continuously reassuring, promising, and convincing Mr. Levin and Ms. Kienzle that MAP would pay them, and thereby convincing them to remain with MAP;

d. having no intention to pay Mr. Levin or Ms. Kienzle the salary they earned or to reimburse the expenses they advanced on MAP's behalf;

e. rejecting significant capital infusions into MAP that could have been used to pay Mr. Levin and Ms. Kienzle their earned salary and unreimbursed expenses;

f. paying vendors, internal and external investors, and founders'/management's salary with capital that came into the company instead of using a portion of that money to fully repay Mr. Levin and Ms. Kienzle;

g. using company money for founders'/management's personal use rather than fully repaying Mr. Levin and Ms. Kienzle; and

h. using threats to try to dissuade Mr. Levin from exercising his legal right to sue MAP for his unpaid salary and bonus and his unreimbursed expenses.

201.    In breach of the implied covenant of good faith and fair dealing, MAP did the things and committed the acts alleged above for the purpose of consciously withholding from Mr. Levin and Ms. Kienzle the rights and benefits to which they were and are entitled under their Employment Contracts, and without considering the interests of Mr. Levin and Ms. Kienzle at least to the same extent as it did its own interests.

202.     As a direct and proximate result of MAP's wrongful breach of the implied covenant of good faith and fair dealing, Mr. Levin and Ms. Kienzle have been and continue to be damaged in their property.

203.     MAP's actions in intentionally breaching the implied covenant of good faith and fair dealing are extreme and outrageous, were undertaken maliciously, deliberately, and with willful intent to cause harm to Mr. Levin and Ms. Kienzle, and Mr. Levin and Ms. Kienzle are therefore entitled to recover punitive damages against all of the Defendants, which are all alter egos of each other.

204.     Accordingly, Mr. Levin and Ms. Kienzle have been damaged by all of the Defendants, which are all alter egos of each other, in an amount to be determined at trial, together with costs, interest, attorney's fees, and punitive damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
**(Breach of N.Y. Labor § 195)**

205.     Mr. Levin and Ms. Kienzle reallege and incorporate by reference herein each allegation contained in paragraphs 1 through 204 above.

206.     Under N.Y. Labor § 195, employers are required to

a. notify their employees, in writing, at the time of hiring of the regular pay day designated by the employer and obtain a written acknowledgement from each employee of receipt of this notice;

b. notify their employees of any changes in the pay days prior to the time of such changes; and

c. furnish each employee with a statement with every payment of wages, listing gross wages, deductions, and net wages.

207.    MAP did not notify Mr. Levin or Ms. Kienzle when they were hired of the regular pay day designated by MAP; the Employment Contracts simply provided that they would be "paid in accordance with current company payroll procedures," yet they received no description of those procedures, including when the regular pay day would be.

208.    MAP did not notify Mr. Levin or Ms. Kienzle in advance that they would not be paid on a timely or regular basis.

209.    Except for a year-end W2, MAP did not furnish Mr. Levin with a statement with any of the wage payments that he received through January 25, 2010 or with the July 25, 2010 payment he received, and MAP did not furnish Ms. Kienzle with a statement with the only wage payment that she received on July 25, 2010.

210.    All of the Defendants, which are all alter egos of each other, thus have violated N.Y. Labor § 195 with respect to Mr. Levin and Ms. Kienzle.

211.     Accordingly, Mr. Levin and Ms. Kienzle have been damaged by all of the Defendants, which are all alter egos of each other, in an amount to be determined at trial, together with costs, interest, attorney's fees, and liquidated damages as provided by the New York labor law.

## FIFTH CLAIM FOR RELIEF
### (Conversion)

212.    Mr. Levin and Ms. Kienzle reallege and incorporate by reference herein each allegation contained in paragraphs 1 through 212 above.

213.    Mr. Levin advanced $10,272.79 in approved expenses on MAP's behalf that remain unreimbursed, and Ms. Kienzle advanced $13,248.88 in approved expenses on MAP's behalf that remain unreimbursed.  Together, Mr. Levin and Ms. Kienzle have advanced $23,521.67 in approved expenses on MAP's behalf that remain unreimbursed.

214.    Mr. Levin and Ms. Kienzle have personal interests in the funds that they advanced as approved expenses on MAP's behalf that remain unreimbursed.

215.    Despite having no right to do so, all of the Defendants, which are alter egos of each other, have taken Mr. Levin's and Ms. Kienzle's property and converted that property for their own personal use, thereby depriving Mr. Levin and Ms. Kienzle of their property and of the value of such property.

216.    As a direct and proximate result of such conduct, Mr. Levin and Ms. Kienzle have been and continue to be damaged in their property.

217.    The actions of all of the Defendants, which are all alter egos of each other, in intentionally converting Mr. Levin's and Ms. Kienzle's funds for the personal use of the Defendants, which are all alter egos of each other, are extreme and outrageous, were undertaken maliciously, deliberately, and with willful intent to cause harm to Mr. Levin and Ms. Kienzle, and Mr. Levin and Ms. Kienzle are therefore entitled to recover punitive damages against all of the Defendants, which are all alter egos of each other.

218.    Accordingly, Mr. Levin and Ms. Kienzle have been damaged by all of the Defendants, which are all alter egos of each other, in an amount to be determined at trial, together with costs, interest, attorney's fees, and punitive damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### (Unjust Enrichment)

219.    Mr. Levin and Ms. Kienzle reallege and incorporate by reference herein each allegation contained in paragraphs 1 through 219 above.

220.    Mr. Levin advanced $10,272.79 in approved expenses on MAP's behalf that remain unreimbursed, and Ms. Kienzle advanced $13,248.88 in approved expenses on

MAP's behalf that remain unreimbursed.  Together, Mr. Levin and Ms. Kienzle have advanced $23,521.67 in approved expenses on MAP's behalf that remain unreimbursed.

221.   Mr. Levin and Ms. Kienzle conferred those benefits on all of the Defendants, which are all alter egos of each other, benefits that the Defendants are not entitled to because the Defendants were obligated to return those funds to Mr. Levin and Ms. Kienzle and have not done so.

222.   All of the Defendants, which are all alter egos of each other, unreasonably, and without any justification in law or fact, have retained those funds that Mr. Levin and Ms. Kienzle advanced on MAP's behalf, and have thus been unjustly enriched.

223.   It would be inequitable for any of the Defendants, which are all alter egos of each other, to retain any of the $23,521.67 in expenses that Mr. Levin and Ms. Kienzle advanced on MAP's behalf.

224.   Mr. Levin and Ms. Kienzle therefore are entitled to restitution of the $23,521.67 that they advanced in approved expenses on MAP's behalf from all of the Defendants, which are all alter egos of each other.

### SEVENTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

225.   Mr. Levin and Ms. Kienzle reallege and incorporate by reference herein each allegation contained in paragraphs 1 through 225 above.

226.   In continuously promising and reassuring Mr. Levin and Ms. Kienzle that it would bring in capital infusions that would be used to pay Mr. Levin's and Ms. Kienzle's unpaid salary and unreimbursed expenses, MAP represented that additional money would come into the company and be used to pay Mr. Levin and Ms. Kienzle.  MAP also represented that it would provide equity to Mr. Levin and Ms. Kienzle.

227.   If these representations were false, MAP knew or should have known that these representations were false because MAP had all of the information regarding potential investors and equity disbursements and MAP's executives knew or should have known that they would reject capital infusions that would reasonably dilute their equity and take away some of their managerial control, and that they would not in fact give Mr. Levin and Ms. Kienzle any equity.

228.   Mr. Levin and Ms. Kienzle did in fact reasonably believe MAP's representations that MAP would bring in additional capital and use it to fully pay Mr. Levin and Ms. Kienzle and would provide Mr. Levin and Ms. Kienzle with equity in MAP.  Mr. Levin and Ms. Kienzle did in fact rely upon these representations and thus remained with the company instead of seeking employment elsewhere.

229.   As a direct and proximate result of MAP's misrepresentations, Mr. Levin and Ms. Kienzle have been damaged by all of the Defendants, which are all alter egos of each other, in an amount to be proven at trial.

WHEREFORE, Mr. Levin and Ms. Kienzle pray for judgment as follows:

## ON THE FIRST CLAIM FOR RELIEF

230.   For declarations in accord with Mr. Levin's and Ms. Kienzle's contentions stated above;

## ON THE SECOND CLAIM FOR RELIEF

231.   For damages according to proof at the time of trial, plus interest, but not less than $117,185.04, plus interest;

## ON THE THIRD CLAIM FOR RELIEF

232.   For damages according to proof at the time of trial, plus interest;

233.    For reasonable attorney's fees and costs incurred in obtaining the benefits

due under the Employment Contracts, according to proof at the time of trial, plus interest;

234.    For punitive damages in an amount to be determined at the time of trial;

### ON THE FOURTH CLAIM FOR RELIEF

235.    For damages according to proof at the time of trial, plus interest;

236.    For reasonable attorney's fees and costs incurred in remedying MAP's

violation of N.Y. Labor § 195, according to proof at the time of trial, plus interest;

237.    For liquidated damages as provided by New York labor laws;

### ON THE FIFTH CLAIM FOR RELIEF

238.    For damages according to proof at the time of trial, plus interest;

239.    For reasonable attorney's fees and costs incurred in recovering the funds

that MAP converted from Mr. Levin and Ms. Kienzle, according to proof at the time of

trial, plus interest;

240.    For punitive damages in an amount to be determined at the time of trial;

### ON THE SIXTH CLAIM FOR RELIEF

241.    For restitution of $23,521.67, which Mr. Levin and Ms. Kienzle advanced

in approved expenses on MAP's behalf, plus interest;

### ON THE SEVENTH CLAIM FOR RELIEF

242.    For damages according to proof at the time of trial, plus interest;

### ON ALL CLAIMS FOR RELIEF

243.    For Mr. Levin's and Ms. Kienzle's costs of suit incurred herein;

244.    For such other, further, and/or different relief as the Court may deem just

and proper.

## DEMAND FOR JURY TRIAL

Mr. Levin and Ms. Kienzle hereby demand a trial by jury in this action.


DATED: February  , 2011          LAW OFFICE OF AVNER MIZRAHI


By:  s/ Avner E. Mizrahi

Avner E. Mizrahi (AM-5674)
Attorney for Plaintiffs

avner@avnermizrahi.com
205 East 63rd Street, #8C
New York, NY 10021
Tel:  (646) 397-4150
Fax:  (626) 605-8972

# Exhibit 1

 **MAP**

Map International
152 W 57th street
54th Floor
New York, NY 10019
USA

Benjamin D. White
*Chief Operating Officer*

Benjamin.White@maplh.com
+1.212.561.5338

August 2009

Dear Phil:

Firstly, on behalf of the entire company I want to thank you again for the significant impact that you have made on our operations in Uganda over the last six months. Your dedication to the cause and your ability to work in the differing environments that we find in Uganda has been noted across the organization. I look forward to your continued and long-term involvement in MAP, transitioning from your current role to a full time member of the organization. Per our last conversation, I would like to outline the role details, macro components of a salary and benefits package under consideration. Please let me know if you have any questions or feedback.

**TITLE:**              Director of Mobile Banking

**START DATE:**         September 1, 2009

**RESPONSBILITIES:**    As a member of the corporate commercial team your focus will be to ensure the successful rollout of the MAP platform to our target markets. Your initial focus will be to help stabilize our various product streams in Uganda. Subsequent to stabilization in Uganda you will either take a commercial launch role in a future country or a more senior role in the Ugandan operation. Determination of role will be based on the needs of the company, individual markets and your personal interests – and will be conducted in a collaborative way.

**INITIAL DUTIES:**     Your first assignment will be focused on leading the commercial dimensions of our partnership with Uganda Telecom. As part of this role you will support the creation of a nation-wide network of POS access points and the commercial development of products.

**REPORTS TO:**         Chief Operating Officer. Dotted line relationships to local market leadership as determined by the particular role you are playing.



Map International
152 W 57th street
54th Floor
New York, NY 10019
USA

**Benjamin D. White**
*Chief Operating Officer*

Benjamin.White@mapih.com
+1.212.561.5338

**Base Compensation:** $80,000 per annum, paid in accordance with current company payroll procedures. We look to increase this base salary amount to more competitive levels as the company transitions from startup/launch phase to ongoing revenue generation. Timing of your salary escalation will be jointly determined by both the company's financial performance as well as your individual performance/contribution. We will hardwire a salary review into your first formal performance review session which will take place six months after your joining date. In addition, there will be an interim performance review at three months after the joining date without salary review.

**Bonus Plan:** In addition to your base salary, you will participate in the Annual Company Bonus Plan along with other members of the management team. Your participation will be a percentage of your base salary paid during the calendar year, for achievement of specific targeted Corporate goals and individual goals. . These corporate and individual goals will be established at the start of each performance year and will be documented in your individual performance plan which will be jointly developed and reviewed by you and your supervisor. We look to develop your first performance plan at your three-month interim review session.

**Equity:** The Company is establishing an equity- based Profit Sharing Plan (ESOP) for key team members with our Investment Banking partners – Total Impact Advisors. You will be a member of the Plan and will receive a percentage interest in the Plan distributions. This Plan will be launched at the close of the company's first round of financing, which is scheduled to take place in the fourth quarter of this year. Distribution of interest in the Plan will occur annually to members in accordance with achievement of predetermined and communicated Corporate and individual goals. Your contribution to the company from start date until date of ESOP creation will be recognized in your first disbursement.

**Business Tools:** MAP will provide you with our executive toolkit of technology devices to appropriately and effectively complete your duties. The tool kit includes: a laptop, blackberry, local-country cellular phone, internet connectivity, and VOIP phone for your home.

**Expatriate Program:** This position is intended to be an in-country, full-time expatriate position in one, or multiple, MAP markets. You will be provided a monthly EXPAT stipend of $1350 USD to cover housing and related expenses. This amount shall be paid to you on the first of each month from the local (in-country) business unit you are working in.



Map International
152 W 57th street
54th Floor
New York, NY 10019
USA

**Benjamin D. White**
*Chief Operating Officer*

Benjamin.White@mapih.com
+1.212.561.5338

You will be expected to be in country for two month stints. Once every eight weeks, you will be asked to spend a week in the United States. The off week shall be utilized for business activities in MAP's New York office. Scheduling for all trips will be determined by local country and corporate business needs and will be approved by your supervisor.

Vacation can be taken as needed and approved by your supervisor.

You will be issued a company corporate card for business related expenses as identified in the Company's T&E policies.

***Medical Coverage:*** As of June 2010, the Company will enroll you in an International Health plan created specifically for global professionals. The plan shall include both international and domestic coverage and medical evacuation coverage. In the interim, we will cover "International Citizen" medical insurance (Reside Prime) and a yearly check-up with a general practitioner, dentist and optometrist in the United States. The Company will also cover all travel-related vaccinations and medical attention as prescribed by the US CDC for international travel and will provide appropriate travelers' insurance.

Signature: ...........................................................

Date: ...........................................................

# Exhibit 2

 MAP

Map International
152 W 57th street
54th Floor
New York, NY 10019
USA

**Benjamin D. White**
*Chief Operating Officer*

Benjamin.White@mapih.com
+1.212.561.5338

March 2010

Dear Lisa:

Firstly, on behalf of the entire company I want to thank you again for the significant impact that you have made on our operations in Uganda over the last six months.  You dedication to the cause and your ability to work in the differing environments that we find in Uganda has been noted across the organization. I look forward to your continued and long-term involvement in MAP, transitioning from your current role to a full time member of the organization. Per our last conversation, I would like to outline the role details, macro components of a salary and benefits package under consideration.  Please let me know if you have any questions or feedback.

**TITLE:**               Director of Branchless Banking

**START DATE:**   Ben   ~~March~~ APRIL 15, 2010 Link

**RESPONSBILITIES:**   As a member of the corporate commercial team your focus will be to ensure the successful rollout of the MAP platform to our target markets.  Your initial focus will be to help stabilize our various product steams in Uganda.  Subsequent to stabilization in Uganda you will either take a commercial launch role in a future country or a more senior role in the Ugandan operation.  Determination of role will be based on the needs of the company, individual markets and your personal interests – and will be conducted in a collaborative way.

**INITIAL DUTIES:**   Your first assignment will be to lead the deployment and stabilization of the branchless banking platform and PostBank Uganda.  You will also lead the deployment of the platform with additional banks that are added to the network.

**REPORTS TO:**   Chief Operating Officer.  Dotted line relationships to local market leadership as determined by the particular role you are playing.

 MAP

Map International
152 W 57th street
54th Floor
New York, NY 10019
USA

**Benjamin D. White**
*Chief Operating Officer*

Benjamin.White@mapih.com
+1.212.561.5338

**Base Compensation:** $80,000 per annum, paid in accordance with current company payroll procedures. We look to increase this base salary amount to more competitive levels as the company transitions from startup/launch phase to ongoing revenue generation. Timing of your salary escalation will be jointly determined by both the company's financial performance as well as your individual performance/contribution. We will hardwire a salary review into your first formal performance review session which will take place six months after your joining date. In addition, there will be an interim performance review at three months after the joining date without salary review.

**Bonus Plan:** In addition to your base salary, you will participate in the Annual Company Bonus Plan along with other members of the management team. Your participation will be a percentage of your base salary paid during the calendar year, for achievement of specific targeted Corporate goals and individual goals. . These corporate and individual goals will be established at the start of each performance year and will be documented in your individual performance plan which will be jointly developed and reviewed by you and your supervisor. We look to develop your first performance plan at your three-month interim review session.

**Equity:** The Company is establishing an equity- based Profit Sharing Plan (ESOP) for key team members with our Investment Banking partners – Total Impact Advisors. You will be a member of the Plan and will receive a percentage interest in the Plan distributions. This Plan will be launched at the close of the company's first round of financing, which is scheduled to take place in the fourth quarter of this year. Distribution of interest in the Plan will occur annually to members in accordance with achievement of predetermined and communicated Corporate and individual goals. Your contribution to the company from start date until date of ESOP creation will be recognized in your first disbursement.

**Business Tools:** MAP will provide you with our executive toolkit of technology devices to appropriately and effectively complete your duties. The tool kit includes: a laptop, blackberry, local-country cellular phone, internet connectivity, and VOIP phone for your home.

**Expatriate Program:** This position is intended to be an in-country, full-time expatriate position in one, or multiple, MAP markets. You will be provided a monthly EXPAT stipend of $1350 USD to cover housing and related expenses. This amount shall be paid to you on the first of each month from the local (in-country) business unit you are working in.



Map International
152 W 57th street
54th Floor
New York, NY 10019
USA

**Benjamin D. White**
*Chief Operating Officer*

Benjamin.White@mapih.com
+1.212.561.5338

You will be expected to be in country for two month stints.  Once every eight weeks, you will be asked to spend a week in the United States. The off week shall be utilized for business activities in MAP's New York office.  Scheduling for all trips will be determined by local country and corporate business needs and will be approved by your supervisor.

Vacation can be taken as needed and approved by your supervisor.

You will be issued a company corporate card for business related expenses as identified in the Company's T&E policies.

**Medical Coverage:**  As of June 2010, the Company will enroll you in an International Health plan created specifically for global professionals.  The plan shall include both international and domestic coverage and medical evacuation coverage.  In the interim, we will cover travelers medical insurance (Reside Prime) and a yearly check-up with a general practitioner, OB/GYN, dentist and optometrist in the United States. The Company will also cover all travel-related vaccinations and medical attention as prescribed by the US CDC for international travel and will provide appropriate travelers' insurance.

Signature: ........................................

Date: ........................................

# Exhibit 3



# TRANSFORMING
FINANCIAL SERVICES
FOR UNDER-SERVED MARKETS

**Payables Review &
Immediate Cash Review**

*August 16, 2010*

*MAP International
152 West 57th Street
Fifty Fourth Floor
New York, NY 10019
www.mapih.com*

# Payables as 8/16/10

| Payee | Estimated Amount | Thru EOM | Relationship | Priority of Relationship | NOTES |
|-------|------------------|----------|--------------|--------------------------|-------|
| Theo | $185,000.00 | July | Employee | 1 | theo sent 50K on 7/29; sent $60K on 8/9 |
| Johannes | $30,000.00 | July | Employee | 1 | $10K sent 7/28 |
| Neptune | $26,000.00 | Aug | Partner | 2 | upon completion of successful Waz implementation still owe additional $26K |
| Computer Point | $56,730.00 | July | Financing | 1 | 30k paid on 8/16 |
| OPIC | $122,140.00 | June | Financing | 1 | |
| Craig | $0.00 | | Former Employee | 0 | |
| Abib | $5,000.00 | | Former Employee | 0 | |
| Emmanuel | $38,500.00 | July | Employee | 1 | Look GIB Bank Acct; real number might be $20K |
| Chaim | $83,314.00 | July | Former Employee | 2 | MAP number is 54972 based in verbal deal; Awaiting lawsuits |
| Lisa | $35,500.00 | 15-Aug | Employee | 1 | $3900 deducted for pymnt via UGA acct for rent; 5K salary paid 7/29 |
| Phil | $54,000.00 | 15-Aug | Employee | 1 | 5k salary paid 7/29 |
| Roscoe | $20,000.00 | | Employee | 2 | $5K paid 7/28/10 |
| Tim | $58,382.00 | JULY | Employee | 3 | Employee contends # is $118,000.  $135K under question for misappropriation |
| Benjamin | $272,000.00 | July | Employee | 1 | |
| UG Salaries | $0.00 | July | Employee | 1 | Doesn't include Roscoe; - Approx amt paid on 7/30/10; Paid Aug 3 |
| Spark | $37,000.00 | | Vendor | 1 | |
| nCipher | $38,340.00 | | Vendor | 3 | |
| Posta | $5,000.00 | | Partner | 2 | |
| Shmuli | $37,000.00 | | Vendor | 1 | sent $10K on 8/10 |
| State Farm | $1,038.00 | | Vendor | 1 | |
| Tax Penalties | | | | | |
| Current UG | $174,951.00 | June | | 1 | |
| Nuberger | $95,000.00 | | Vendor | | Verify how much Map Cash vs. Map intl |
| Serena | $4,500.00 | | Former Employee | 3 | |
| Sam Adler | $8,000.00 | | Former Employee | 3 | |
| Aaron Popack | $55,000.00 | 15-Aug | Former Employee | 2 | |
| NY State Insurance (penalty) | $124.00 | | Vendor | 1 | |
| Malamud | | | | 0 | 75,000 moved to ML private loan list |
| NY Accounts PAST DUE | $1,323.00 | | Vendor | 1 | |
| NY Accounts 08-09 | $5,000.00 | | Vendor | 1 | |
| Alan Operman | $2,400.00 | July | Employee | 1 | |
| Paynet | $40,451.03 | June | Vendor | 2 | |
| Imperial Royal (Not Rent) | $4,548.00 | June | Vendor | 2 | |
| PWC | $18,290.00 | | Service Provider | 3 | |
| Sheraton Health Club | $1,800.00 | June | Vendor | 3 | |
| Airtime | $4,762.00 | | Operational | 1 | |
| | $1,521,093.03 | | | | |
| Kitende | $223,000.00 | July | Vendor | 3 | Eli believes the actual number $20k |
| Total | $1,744,093.03 | | | | |

1



# Under the *Most* Aggressive Timeframes, it Will be at Least Three Weeks Until BAP Money is Available

- Hence, a target date of 9/6 – at the earliest

- Percent owed as of 8/16, not 9/6

- Absolute necessity payments

| Category | Payee | Relationship | Amount | Percent Owed | Note |
|---|---|---|---|---|---|
| **Payroll** | Theo | Employee | $60,000 | 32% | Technology group.  Less than one month payment |
| | Johannes | Employee | $10,000 | 33% | On verge of leaving.  Only staying with transaction |
| | Emmanuel | Employee | $10,000 | 26% | On verge of leaving.  Only staying with transaction |
| | Lisa | Employee | $17,750 | 50% | Resigned on Friday.  Prereq for staying |
| | Phil | Employee | $27,000 | 50% | Resigned on Friday.  Prereq for staying |
| | Roscoe | Employee | $7,000 | 35% | Backpay |
| | Benjamin | Employee | $50,000 | 18% | Not salary – need for credit card reimbursement |
| | UG Salaries | Employee | $25,000 | | |
| **Vendors** | Spark | ATM Provider | $5,000 | 100% | Absolute need - months behind on maintenance |
| | Spark | ATM Provider | $10,000 | | Absolute need - months behind on maintenance |
| | Paynet | Switch | $40,451 | 100% | |
| | Shmuli | Travel Agent | $37,000 | 100% | Wont book tickets without payment |
| | Shmuli | Travel Agent | $10,000 | | Need three trips |
| | ncipher | Thales | $12,780.00 | 33% | Will ruin credit |
| **Operational** | Cards | PBU | $10,000 | | Need for PBU cards.  20k+ backlog |
| | Ribbons | PBU | $10,000 | | Need for 20k backlog |
| | Cybernet | POS Provider | $40,000 | | Need for POSTA and UTL |
| | POSTA | Launch | $5,000 | | |
| | Airtime | POSTA | $10,000 | | |
| | Data Move | Travel | $12,000 | | Required for Mengo House move and DFCU test |
| | Imperial Royal | Rent | $19,364 | | Will throw us out |
| | AAR Health | UG Health Ins | $11,336 | | Employees havent had insurance since April |
| | X-Tel | Phones | $1,106 | | Need for PBU mobile launch |
| | NSSF | Soc Security | $26,556 | | Dangerous situation |
| | PAYE | UG Rev Auth | $20,000 | 20% | More Dangerous situation |
| | Airtime | General | $4,762 | | |
| **Penalties/Suits** | Chaim | Former Employee | $27,771.33 | 33% | Will sue us (all of us) without payment and plan |
| **Financing** | Computer Point | IT Financing | $8,667 | 33% | Required to keep systems "on" |
| **Rwanda** | IT Hardware | Multiple | $85,000.00 | | Contractual Obligation |
| | Gabriel | ExPat | $57,500.00 | | Required to fufill contractual obligation |
| | | TOTAL | $671,043.03 | | |

2



# Exhibit 4

## Lisa Kienzle

| | |
|---|---|
| **From:** | Phil Levin |
| **Sent:** | Tuesday, August 10, 2010 5:43 PM |
| **To:** | Eli Popack |
| **Cc:** | Lisa Kienzle |
| **Subject:** | Following today's call |

Hi Eli,

Thank you for taking the time to speak with us this morning about the current fundraising efforts. We truly appreciate your candor and your willingness to speak with us about where we stand. And we do understand the level of strain you are currently under balancing the needs of the company, staff and existing investors.

Following the call, Lisa and I thought through the conversation further, and we have some thoughts to share. We are writing you a joint note here, because we find ourselves 100% on the same page with all of this and thought it might be better to have these conversations together.

First, we wanted to lay out several assumptions that I think we all recognize:

- We have $1 - 1.5M in non-negotiable, non-deferrable accounts payables outstanding
- In addition to the accounts payable, we need another $2M to grow the business and provide runway over the next 1-2 years. This puts the funding requirement at about $3M.
- While we do have some revenue coming in from our businesses now, it is nowhere close to covering our expenditure and does not in any way defer our financing needs
- There are no major additional sources of revenue expected in the next 3 months that will change the above equation.

I think we all agree that we need $3M to be in this game. However, Lisa and I further believe this infusion is urgent and cannot be delayed any further or trickle in through individual installments over time (e.g. $500k to start off). To confidently run an operation, we need a war chest – operating funds we can rely on for current and future initiatives. Neither of us feel comfortable running a business off of promises of an investor "safety net."

Additionally, we believe the business has become a house of cards poised to topple with any additional setback. There is an excruciatingly small window in which this financing figure remains relevant for us – after which, it's too late and the business will fail no matter how much we raise. Here are some factors leading toward that conclusion:

- Our new employee is flying in the 18th to kick-off our Rwandan operations. Those operations are not funded, his salary is not funded, and we lack a clear path to fund either. We are not willing to bring someone on board and immediately be unable to pay for items as simple as his cab fare from the airport, let alone his salary.
- Morale in the office is at its absolute low – it has been months since anyone was paid on time, there is no health insurance for employees and their families, we are paying for our own basic items like toilet paper and printer supplies to keep the office running.
- Our core partners have lost faith in us. Wazalendo has been sorely disappointed by our service delivery. A PBU executive said, in respect to us suggesting a mobile banking launch date, "Ha – MAP never delivers anything that works, or anything on time." We are precariously close to losing these contracts, and much of it is due to lack of funding to fix problems (e.g. Paynet migration, server migrations to KLA, ATM spares). If we are to continue, we must make the necessary investment needed to fix these businesses immediately. The loss of any one of these partners would hurt us tremendously.

- Our professional reputation in Uganda is at high risk.  We are under-serving our partners, and this WILL impact us when we try to expand.  We are also delinquent with every possible payment – landlords, utilities, car drivers, and worst of all, the URA.  It's a small business world here, and we are quickly destroying our credibility.
- We are going to lose key staff.  Frankly, I'm surprised we haven't lost more than Chaim already.  It's a testament to how much we care about the people, the organization, and the vision that this hasn't happened.  However, the business has been stretched too thin and working within the constraints and uncertainty too frustrating.  Without immediate funding, key staff will walk. Emmanuel is going to walk. Johannes is going to walk. We are going to walk.

Eli, this is not about loyalty.  It's not about doubting the company's mission or model.  It's simply the recognition that the company is undercapitalized and it will not succeed undercapitalized.  And neither of us can justify working for a company that we feel will not succeed.

**So we are going to draw a line in the sand:** MAP must bring in the majority of the $3m by *this Friday* for us to stay on board.  We've been waiting too long with the continued promises that money will come from investors with just a little more time.  *If we do not have $3M Friday in the MAP accounts, Lisa and I are both going to resign then and pursue other opportunities.*

We are willing to discuss this further if you would like to walk through our thoughts.  This company has great potential and we are grateful and thrilled to be a part of it. However, we just don't see a path to success without immediate funding of $3M.  If we protract our fundraising any further, we simply cannot stay afloat.  We're on the ground and we know the operational reality.  And neither of us is willing to continue watching us disappoint our colleagues, clients, and our friends in the local operation.

Thank you for taking the time to hear us out.

All the best,

Lisa and Phil

********* Important Notice*********
The information contained in the linked e-mail transmission and any attachments may be legally privileged and confidential and is intended only for the use of the person(s) named in the linked e-mail transmission. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or duplicating of this e-mail transmission or any attachments is strictly prohibited. If you are not the intended recipient, please contact the sender immediately by reply e-mail and destroy all copies of the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you.
********* Important Notice*********

# Exhibit 5

**Lisa Kienzle**

| | |
|---|---|
| **From:** | Lisa Kienzle |
| **Sent:** | Friday, August 13, 2010 7:16 PM |
| **To:** | Michael Landau; Eli Popack |
| **Cc:** | Phil Levin |
| **Subject:** | Letter or Resignation |

Dear Michael and Eli,

This is a difficult note to write after having worked together for over 1.5 years (for Phil) and almost 1 year (for me), but the time has come for us to move on.  This email confirms our resignation from MAP.

As we wrote Tuesday, we both strongly believe immediate capitalization of $3M is absolutely critical for the company's success.  This has not occurred.  While lesser funds may temporarily stave off creditors, Phil and I fail to see how any plan lacking immediate significant investment could salvage the organization.

It's not without tremendous respect for the groundbreaking initiative you've driven and gratitude for the opportunity to have been a part of it that that we do this.  Truly, we thank you for the opportunity.

I am returning Sunday night to gather my belongings and close down my life in Uganda.  Both of us are taking off work starting Monday to plan a transition for our roles at MAP.

Of course, we must settle the significant debts owed to Phil and myself – to this day we still have lent the company more money (in expenses) than we've ever been paid.  We understand immediate payment is not possible, but we will be asking for a signed letter detailing what is owed and a payment plan before we fully hand over our work and relationships.  Being out seven months of wages and supporting significant local office expenses is extraordinarily challenging for anyone, but not being paid has been especially difficult for me, who now has no savings and continued monthly school loan payments to service.

We will provide a document Monday detailing the elements of a handover and will remain in Uganda for as long as reasonable to transition our work.  We want to make this a smooth transition and ensure continuity (as best we can) for whoever you decide should take over our roles.  Phil will be calling Gabriel to cancel his fellowship for Rwanda unless you have thoughts on another way to proceed.

We are saddened to find ourselves at this crossroads.  We hope the company is able to find its feet again and live out your vision and the promise of what it can be.

Kind regards,
Lisa and Phil

_____
**Lisa Kienzle**
*Director of Branchless Banking*

**MapSwitch Uganda**
5th Floor Imperial Royale
Plot 7 Kintu Road
P.O. Box 21673,
Kampala, Uganda
tel/fax:  +256 414 345 856
mob:  +256 718 370 695
www.mapinternational.net

********** Important Notice**********
The information contained in the linked e-mail transmission and any attachments may be legally privileged and confidential and is intended only for the use of the person(s) named in the linked e-mail transmission. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or duplicating of this e-mail transmission or any attachments is strictly prohibited. If you are not the intended recipient, please contact the sender immediately by reply e-mail and destroy all copies of the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you.
********** Important Notice**********

# Exhibit 6

**Lisa Kienzle**

| | |
|---|---|
| **From:** | Phil Levin |
| **Sent:** | Tuesday, August 17, 2010 8:44 AM |
| **To:** | Eli Popack; Michael Landau |
| **Cc:** | Lisa Kienzle |
| **Subject:** | Transition from MAP (post-resignation) |

Dear Eli and Michael,

As of Monday, we have ceased working for MAP and have not come into the office this week as we await guidance from you on a transition plan.  This letter is meant as a first step in a transition covering:
- What is owed to us by MAP and our expectations for repayment
- How we transition out of MAP in a way that enables business continuity and transfer of key relationships
- Preconditions for us undertaking a transition

Everyone has had to make financial sacrifices – we realize this. For Lisa and I, the situation is unusually tough – we were later entrants (as salaried employees) and have never experienced the "good times" of consistent salary payments and expense reimbursement.

The following illustrates how little we have received from MAP during  our employment:
- Lisa's cumulative salary / stipend drawn from MAP (10 months work): $11,950 or ***$14,340 annualized***
- Phil's cumulative salary / stipend drawn from MAP (18 months work):  $36,171 or ***$24,114 annualized***

Clearly these figures fall far short of our personal expenditures, even before considering the significant operating expenses we fronted for the local office out of our own pockets.  Both Lisa and my savings are entirely depleted as a result of our employment, and we have to look to friends and family to fund future obligations (e.g., school loan repayments).  Neither of us has been in the work force long enough to build savings to weather this type of storm.  **MAP has left both of us in financial ruin**.

**Outstanding Obligations:**

Following is what is owed to us (assuming August 27th last day post-transition):

Lisa
Unpaid Salary: $24,778
Unreimbursed Expenses: ~$10,000 (exact figure TBD)
**Total: $34,778**

Phil:
Unpaid Salary: $47,332
Unreimbursed Expenses: Exact figure TBD (between $5k – 10k)
**Total: $52k – 57k**

We are asking that in return for uprooting our lives to move to East Africa to launch this business (and fully putting our heart into building the vision), the company finds a way to reasonably compensate us for that work.

**Preconditions for us doing a proper transition**

The below describes what we would need to do to ensure the success of a complex, delicate transition, and the continuity of MAP.  We all know this won't be easy.

**Please understand this**: We are simply unwilling to work toward a proper transition if the company refuses to rectify what it owes us.  Neither Lisa nor I will begin any transition or do any work until our outstanding obligations are paid in full.

We understand there are large debts to address, but we also know, as you pointed out repeatedly last week, the company is generating real revenue.  We would hope we can be first in line for a piece of that revenue – ahead of external creditors and vendors and new investment.  To do otherwise strikes us as callous and fundamentally dishonorable to your employees who have already made such a large sacrifice to get you to this point.

We know $130k is in the Ugandan account now. We know about $60k more is coming in at the end of the month.  We also know there are funds to draw on in New York.  Paying us is possible.  It simply requires valuing your long-disregarded employees above your vendors and creditors for this one month.

## Providing Transition for MAP

This will need to be handled delicately.

Lisa and I span most aspects of the operation, and for many of our key partners we are the face of MAP. Right now all DFCU knows is Lisa.  All Rwandatel knows is Phil.  With the exception of PostBank, these are not Roscoe relationships.

Here's a list of the important external stakeholders for whom Lisa or I are primary owners.  These must be carefully informed about the transition and shepherded to new owners in a way that doesn't cause alarm and lose MAP business.

DFCU (Lisa)
-   Wilbrod Owor – Head of Consumer Banking
-   Yudaya Musisi – Head of Transaction Banking / E-Business

Uganda Telecom (Phil)
-   Menghis Tesfai – CTO
-   Mohamadou Konkobo – CMO
-   David Owino – Mobile Money Project Director
-   Christine Tantuo – CSO
-   … the M-Sente team

Rwandatel (Phil)
-   Francis Egbuson – CCO
-   Ghislain Nkeramugaba – Mobile Money Project Manager

PostBank Uganda (Lisa)
-   Augustine Kisitu – Head of E-Banking
-   William Alemi – Head of Marketing
-   Florence Nsenga – Marketing Officer
-   The E-Banking Team (4 members)
-   James Kasozi – IT

Simba Telecom (Phil)
-   Scott Mackenzie – CEO
-   Peter Kakaire – COO

Nilecom (Phil)
-   Nuhu Kanyike – GM

Zain (Phil)
- Paul Galandi – Distribution Manager

Warid (Phil)
- Grace Kigundu – Sales Manager

Orange  (Phil)
- Livingstone  Mukwaya – Distribution Manager

TOTAL (Phil)
- Dennis Sserwanja – Retail Manager

Mogas (Phil)
- Victor Mbithi – Retail Manager

Posta (Lisa + Phil)
- David Mulobole – Operations Manager
- The Posta Ops Team

National Water (Phil)
- George Okol – Chief Commercial Manager

Equity Bank (Phil)
- George Kimotho – Head of IT

WSACCO (Lisa)
- Pius Twimyuke – GM
- Flavia Asiimwe – IT Manager

This means face-to-face meetings with everyone in the next two weeks.  These are tough conversations. You need to start thinking about what you would like us to say and who will take our place.  We promise to do our best (as we have always done), but only if you do right by us.

In addition we would look to take the following steps:
- Alert the MAP office of our resignation – **Thursday**
- Begin alerting external partners – **Friday**
- Wrap up transition – **Next Friday  (27th)**
- Handover documentation, contracts, reflections, manuals etc. – **Next Friday (27th)**
- Depart Uganda – **Sometime before September 1st**

This transition is complex, it is quick, but it is possible *if we start soon*. But we are serious that we will not take any steps until we receive the due payment.

We sincerely hope you understand the importance of this note – we care about our clients and we want them and this business to succeed, but we are no longer able, or willing, to support it to our own detriment.

Please provide written confirmation of this documentation and the associated timeframe.

Best,
Phil and Lisa

********** Important Notice**********
The information contained in the linked e-mail transmission and any attachments may be legally privileged and confidential and is intended only for the use of the person(s) named in the linked e-mail transmission. If you are not the intended recipient, or an employee or agent responsible for delivering this message to the intended recipient, you are hereby notified that any dissemination, distribution or duplicating of this e-mail transmission or any attachments is strictly prohibited. If you are not the intended recipient, please contact the sender immediately by reply e-mail and destroy all copies of the e-mail and any attachments immediately. You should not retain, copy or use this e-mail or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Thank you.
********** Important Notice**********

# Exhibit 7

## Lisa Kienzle

| | |
|---|---|
| **From:** | Lisa Kienzle |
| **Sent:** | Tuesday, August 17, 2010 8:53 AM |
| **To:** | Eli Popack |
| **Cc:** | Benjamin White |
| **Subject:** | FW: Transition from MAP (post-resignation) |

Eli,

I have worked at MAP for 10 months now.  To date, I have been paid $11,950, much of which was a living stipend.  I have never received an official paycheck from this company.  I've been promised repeatedly – by you – that if we waited just a bit longer, we would be repaid.  For months, we've waited.  For months, we've not been paid.

Instead, I now have $10,000 in expenses submitted to New York awaiting repayment, another $411 in Uganda, and $171 in cash I provided out of pocket so that Rodney could buy fuel and fix broken ATMs to keep our PBU business running.  And this does not include additional money I have spent, out of pocket, to ensure the local office has basic supplies –drinking water, paper for the printer, even toilet paper – because we have not had the petty cash to cover it.

Following two years of graduate school in which I made no money, I started this job with $18,000 in my bank account – $12,000 went to servicing my loans (I have $1,193 monthly student loan payments I MUST meet) and $5,000 went to medical bills this fall that were not reimbursed because I did not have proper health insurance (insurance I was promised the company would secure that was not provided until July).  This wiped out my savings.

While at MAP, I have borrowed over $13,000 from friends and family over time to live.  My parents are not rich people; I would not have asked this of them if I didn't believe that I would be able to promptly repay them, as you assured us would be possible.  Now, I have $2,500 left in the bank, and loans due around the corner.

Eli, I have never, ever been treated so disrespectfully.  I have worked tirelessly to support this company.  I've reached into my own pockets to personally pay local expenses to make sure the office could keep running.  I've put my reputation on the line with clients, and more poignantly, with new employees who have recently joined this company based on my word.

And while I have been mistreated by this company, I cannot begin to relay how challenging this is for the people on the ground in Uganda.  Kampala, and the villages where our employees' families live, are a far cry from Manhattan.  These are good people, hard-working and honest, and they are here because they also believe in this company, because you called them on a speakerphone two months ago and assured them all would be well soon.  They have been forced to borrow from relatives to eat because they aren't paid on time.  Some of them go without medical care because they don't have health insurance.

I had to sit across from Jane for two weeks while executives in New York and Gibraltar ruminated on whether they would provide the funds for a procedure to alleviate pain she was obviously feeling every day.  When Phil and I visited her in the hospital, she thanked us repeatedly.  It was my most shameful moment at MAP.  A company owes her what they promised – health coverage – and she had to beg for this basic right, and was made to feel in our debt as a result.  We should be the ones feeling shamed that we would cause her any more stress in an already frightening situation.

I want to be clear in this communication:  I will not do pro bono work for this company anymore.  I will not go to the office until I get paid.  I will not provide handover until I am paid.  I will not transition client relationships until I am paid.  We noted in the email below our expenses and salary outstanding.  You'll see that it's not much, in the MAP big picture.  But for me, this is the difference from defaulting on my loans and surviving.

I didn't join a start-up assuming I'd get rich fast.  I knew there was risk involved, and I was willing to take the risk that we wouldn't make it, that I wouldn't see any equity upside, that in 6 months I might be looking for another job.  But I calculated what I needed to live, and my stipend and eventual salary sufficed.  I did not expect to be lied to.  To be ignored.  And to be treated with absolute indifference by people with whom I placed full trust.

I know there are other obligations you and MAP are balancing – some are greater, some are smaller – but as a result of my involvement in this company, I am financially ruined.  I ask that you please look at the impact your next payments have when you are deciding how to allocate the funds you've received.  It means a lot to a creditor when you repay an obligation.  But it means the world to me.

Lisa

_____
**Lisa Kienzle**
*Director of Branchless Banking*

**MapSwitch Uganda**
5th Floor Imperial Royale
Plot 7 Kintu Road
P.O. Box 21673,
Kampala, Uganda
tel/fax:  +256 414 345 856
mob:  +256 718 370 695
www.mapinternational.net

# Exhibit 8

AVNER**MIZRAHI**<sub>ESQ</sub>

119 West 72nd St. # 212 | New York, NY 10023
TEL (646) 397-4150 | FAX (626) 605-8972 | avnermizrahi.com

December 31, 2010

<u>**Via E-Mail**</u>

Michael Landau, Chairman
MAP International Ltd.
152 W. 57th Street, 54th Floor
New York, NY 10019
michael@mapinternational.net

Re:  Failure to pay salary and reimburse expenses to former employees Philip Levin and
Lisa Kienzle

Dear Mr. Landau:

I write on behalf of my clients Philip Levin and Lisa Kienzle, former employees of MAP
International Ltd. and MAP USA Ltd. (collectively "MAP"), for which you serve as
Chairman.  As you are aware, MAP owes $73,429.31 to Mr. Levin and $43,940.85 to Ms.
Kienzle in unpaid salary and bonuses and in unreimbursed expenses, for a total of
$117,370.16.  This letter is an attempt to settle their claims against MAP.

As you are aware, Mr. Levin and Ms. Kienzle together managed several of MAP's major
operations in East Africa.  Mr. Levin began as a fellow on March 15, 2009, and because
of his superior contributions he was promoted to Director of Mobile Banking on
September 1, 2009 with an annual salary of $80,000 plus bonus and benefits.

Ms. Kienzle similarly began as a fellow on October 12, 2009, and because of her
outstanding contributions to MAP she was promoted to Director of Branchless Banking
on April 15, 2010 with the same annual salary of $80,000 plus bonus and benefits.

Despite their hard work and contributions to the company – which Mr. David Eliezer
Popack (MAP's President), other MAP management, and you lauded orally and in
writing on many occasions – neither Mr. Levin nor Ms. Kienzle has been paid the salary
they earned.  Other than one $5,000 payment in July 2010, Mr. Levin has not received a
salary payment since January 25, 2010.  Aside from a similar $5,000 token payment in
July 2010, Ms. Kienzle has not received any salary owed to her.

Perhaps even worse, both Ms. Kienzle and Mr. Levin have advanced more than $16,000
in approved business expenses on MAP's behalf that have not been reimbursed.  On
multiple occasions, Mr. Levin and Ms. Kienzle requested reimbursement of these
expenses and their unpaid salary – both orally and in writing – yet you, Mr. Popack, and
MAP continually refused.

Although you, Mr. Popack, and MAP failed to pay them or reimburse their expenses, Mr. Levin and Ms. Kienzle continued to work tirelessly for MAP, believing in your and Mr. Popack's constant assurances that you would further capitalize MAP and pay them.

It is our understanding that MAP did in fact receive capital infusions shortly before and after my clients resigned.  Instead of using a portion of that money to pay Mr. Levin and Ms. Kienzle, you and Mr. Popack chose to use those funds to pay external vendors, external investors, and even founders' salaries and expenses.  You told my clients that MAP was not giving them any of that money because it did not make business sense to pay them once they resigned.

Your refusals to pay Mr. Levin for seven months and Ms. Kienzle for approximately five months (other than one small, token payment to each of them) forced them to submit their resignations on August 13, 2010.  Immediately afterwards, they once again demanded payment and reimbursement, but you again refused.

What is more, not only did you and Mr. Popack refuse to pay my clients using the significant capital that did come into MAP, but you and Mr. Popack also chose to turn down other, larger capital offers made to MAP that could have been used to pay my clients their earned salaries and unreimbursed expenses.

Your, Mr. Popack's, and MAP's actions represent violations of New York labor laws as well as breaches of the contracts you entered into with Mr. Levin and Ms. Kienzle and the covenants of good faith and fair dealing implied in those contracts.

MAP also is liable for an additional 25% in liquidated damages under N.Y. Labor § 190 et seq.  In violation of New York law, MAP failed to pay my clients on a timely, periodic basis and often failed to give my clients pay stubs (or similar documentation) on the few occasions that MAP actually paid my clients.  Ms. Kienzle never received any payment-related documentation, and Mr. Levin received only one: a W2 at the end of 2009, which listed the employer's address as 460 West 34th St. 10th Floor, New York, N.Y.  This address belongs to MapCash Holdings, LLC, which lists MAP International as a portfolio company.  The address also belongs to a group of interrelated companies, including the Inter Governmental Philatelic Corporation (IGPC); MapCash Inc.; MapCash Management, Ltd.; and Map Financial Group, Inc.

MAP also is liable for punitive damages for breaching my clients' employment contracts in bad faith, prejudgment interest, and attorneys' fees and costs associated with the recovery of my clients' unpaid earnings.  In addition, N.Y. Bus. Corp. § 630 makes you, Mr. Popack, and MAP's other eight largest shareholders personally liable for these amounts if MAP does not pay my clients what is owed to them.  In the event that this matter proceeds to litigation, my clients intend to hold MAP and, as necessary, MAP's related companies, you, Mr. Popack, and the other shareholders liable for at least $145,000 plus punitive damages, prejudgment interest, costs, and attorneys' fees.

My clients intend to file suit on January 12, 2011 if their past due salary and expenses remain unpaid.

If you are interested in resolving Mr. Levin's and Ms. Kienzle's claims, you may contact me to arrange a meeting.  If you contact either of them, they will refer you to me.

Very Truly Yours,

Avner E. Mizrahi
(646) 397-4150 direct dial
(626) 605-8972 direct fax
avner@avnermizrahi.com

cc: David Eliezer Popack <eli@mapinternational.net> (via email)
    Jonathan "Chesky" Malamud <chesky@mapcash.com> (via email)
    Philip Levin <levin.philip@gmail.com> (via email)
    Lisa Kienzle <lisa.kienzle@gmail.com> (via email)

AVNER**MIZRAHI**ESQ

119 West 72nd St. # 212 | New York, NY 10023
TEL (646) 397-4150 | FAX (626) 605-8972 | avnermizrahi.com

December 31, 2010

**Via E-Mail**

David Eliezer Popack, President
MAP International Ltd.
152 W. 57th Street, 54th Floor
New York, NY 10019
eli@mapinternational.net

Re:  Failure to pay salary and reimburse expenses to former employees Philip Levin and Lisa Kienzle

Dear Mr. Popack:

I write on behalf of my clients Philip Levin and Lisa Kienzle, former employees of MAP International Ltd. and MAP USA Ltd. (collectively "MAP"), for which you serve as President.  As you are aware, MAP owes $73,429.31 to Mr. Levin and $43,940.85 to Ms. Kienzle in unpaid salary and bonuses and in unreimbursed expenses, for a total of $117,370.16.  This letter is an attempt to settle their claims against MAP.

As you are aware, Mr. Levin and Ms. Kienzle together managed several of MAP's major operations in East Africa.  Mr. Levin began as a fellow on March 15, 2009, and because of his superior contributions he was promoted to Director of Mobile Banking on September 1, 2009 with an annual salary of $80,000 plus bonus and benefits.

Ms. Kienzle similarly began as a fellow on October 12, 2009, and because of her outstanding contributions to MAP she was promoted to Director of Branchless Banking on April 15, 2010 with the same annual salary of $80,000 plus bonus and benefits.

Despite their hard work and contributions to the company – which Mr. Michael Landau (MAP's Chairman), other MAP management, and you lauded orally and in writing on many occasions – neither Mr. Levin nor Ms. Kienzle has been paid the salary they earned.  Other than one $5,000 payment in July 2010, Mr. Levin has not received a salary payment since January 25, 2010.  Aside from a similar $5,000 token payment in July 2010, Ms. Kienzle has not received any salary owed to her.

Perhaps even worse, both Ms. Kienzle and Mr. Levin have advanced more than $16,000 in approved business expenses on MAP's behalf that have not been reimbursed.  On multiple occasions, Mr. Levin and Ms. Kienzle requested reimbursement of these expenses and their unpaid salary – both orally and in writing – yet you, Mr. Landau, and MAP continually refused.

Although you, Mr. Landau, and MAP failed to pay them or reimburse their expenses, Mr. Levin and Ms. Kienzle continued to work tirelessly for MAP, believing in your and Mr. Landau's constant assurances that you would further capitalize MAP and pay them.

It is our understanding that MAP did in fact receive capital infusions shortly before and after my clients resigned.  Instead of using a portion of that money to pay Mr. Levin and Ms. Kienzle, you and Mr. Landau chose to use those funds to pay external vendors, external investors, and even founders' salaries and expenses.  Mr. Landau told my clients that MAP was not giving them any of that money because it did not make business sense to pay them once they resigned.

Your refusals to pay Mr. Levin for seven months and Ms. Kienzle for approximately five months (other than one small, token payment to each of them) forced them to submit their resignations on August 13, 2010.  Immediately afterwards, they once again demanded payment and reimbursement, but you again refused.

What is more, not only did you and Mr. Landau refuse to pay my clients using the significant capital that did come into MAP, but you and Mr. Landau also chose to turn down other, larger capital offers made to MAP that could have been used to pay my clients their earned salaries and unreimbursed expenses.

Your, Mr. Landau's, and MAP's actions represent violations of New York labor laws as well as breaches of the contracts you entered into with Mr. Levin and Ms. Kienzle and the covenants of good faith and fair dealing implied in those contracts.

MAP also is liable for an additional 25% in liquidated damages under N.Y. Labor § 190 et seq.  In violation of New York law, MAP failed to pay my clients on a timely, periodic basis and often failed to give my clients pay stubs (or similar documentation) on the few occasions that MAP actually paid my clients.  Ms. Kienzle never received any payment-related documentation, and Mr. Levin received only one: a W2 at the end of 2009, which listed the employer's address as 460 West 34th St. 10th Floor, New York, N.Y.  This address belongs to MapCash Holdings, LLC, which lists MAP International as a portfolio company.  The address also belongs to a group of interrelated companies, including the Inter Governmental Philatelic Corporation (IGPC); MapCash Inc.; MapCash Management, Ltd.; and Map Financial Group, Inc.

MAP also is liable for punitive damages for breaching my clients' employment contracts in bad faith, prejudgment interest, and attorneys' fees and costs associated with the recovery of my clients' unpaid earnings.  In addition, N.Y. Bus. Corp. § 630 makes you, Mr. Landau, and MAP's other eight largest shareholders personally liable for these amounts if MAP does not pay my clients what is owed to them.  In the event that this matter proceeds to litigation, my clients intend to hold MAP and, as necessary, MAP's related companies, you, Mr. Landau, and the other shareholders liable for at least $145,000 plus punitive damages, prejudgment interest, costs, and attorneys' fees.

My clients intend to file suit on January 12, 2011 if their past due salary and expenses remain unpaid.

If you are interested in resolving Mr. Levin's and Ms. Kienzle's claims, you may contact me to arrange a meeting.  If you contact either of them, they will refer you to me.

Very Truly Yours,

Avner E. Mizrahi
(646) 397-4150 direct dial
(626) 605-8972 direct fax
avner@avnermizrahi.com

cc: Michael Landau <michael@mapinternational.net> (via email)
    Jonathan "Chesky" Malamud <chesky@mapcash.com> (via email)
    Philip Levin <levin.philip@gmail.com> (via email)
    Lisa Kienzle <lisa.kienzle@gmail.com> (via email)

# Exhibit 9






MapCash, Inc is a promoter and marketer of a traditional cash to debit card international money transfer service. We offer a secure, fast, and inexpensive means to send money from our countries across the Caribbean to offline recipients in over 170 countries. Recipients do not require a bank account or Internet connection to receive funds. Find out more...



Map Financial Group, Inc. was formed to become the largest non-banking financial services provider in the Caribbean and Latin America. It was to pursue this goal through strategic alliances and through aggressive acquisition of complementary companies in the region. Find out more...

   

Home - Company Info - Site Map - Contact        (c) Copyright 2003-2008 Map Holdings





ABOUT MAP HOLDINGS    PORTFOLIO COMPANIES    OUR COMPANY TEAM    NEWS AND INFORMATION    WHERE IN THE WORLD ARE WE    CONTACT INFORMATION



Fastcash loans are an alternative to bouncing checks, pawning personal property, or borrowing money from family and friends, to pay for pressing bills or financial emergencies. Consumers may also use Fastcash loans to avoid late-payment penalties and negative marks on credit ratings. Find out more...



Map International owns and operates a multi-dimensional financial services platform that delivers a mass-market virtual payment solution linking consumers, merchants, banks and service providers. Find out more...

PostCash is the exciting new partnership between Mapcash, IDT, a global

    MAP FINANCIAL GROUP            



ABOUT
MAP HOLDINGS

PORTFOLIO
COMPANIES

OUR COMPANY
TEAM

NEWS AND
INFORMATION

WHERE IN THE
WORLD ARE WE

CONTACT
INFORMATION





Map International owns and operates a multi-dimensional financial services platform that delivers a mass-market virtual payment solution linking consumers, merchants, banks and service providers. Find out more...



PostCash is the exciting new partnership between Mapcash, IDT , a global telecommunications provider, and Inter- Governmental Philatelic Corporation, the leading provider of post office products and services worldwide. PostCash partners with Mapcash as a brand for post offices worldwide to provide better money transfer solutions for their customers. Find out more...

   

Home - Company Info - Site Map - Contact                    (c) Copyright 2003-2008 Map Holdings

# Exhibit 10

